STANLEY *v.* GATES.

Opinion delivered July 1, 1929.

888

*Horace Chamberlin*, for appellant.

*Hal L. Norwood*, Attorney General, *David A. Gates, John L. Carter*, and *Williamson & Williamson*, for appellee.

Attorneys filing briefs as *amici curiae*: *Frank S. Quinn; Jones & Jones; Gaughan, Sifford, Godwin & Gaughan; Rose, Hemingway, Cantrell & Loughborough; Wm. H. Martin; Marsh, McKay & Marlin; Mahony, Yocum & Saye; George A. Hall; Alfred J. Hall; George Vaughan; F. O. Butt; Sam Rorex; Danaher & Danaher; Rowell & Alexander; Coleman & Gantt; Cecil Shane.*

HART, J., (after stating the facts). It is first earnestly insisted that the income tax law under consideration is a property tax, and is therefore violative of the equality and uniformity clause of article 16, § 5, of the Constitution; but the court held adversely to that contention in *Sims* v. *Ahrens*, 167 Ark. 557, 271 S. W. 720, where it was held that an income tax is neither a property tax nor an occupation tax within the meaning of the provision of the Constitution just referred to.

It is next insisted that this holding was *obiter dictum*, and should not be considered binding upon the court in the case at bar. We do not agree with counsel in this

contention. In the first place, this court is committed to the rule that, where grave public interests are involved in a question, the court may waive every point except that of determining the constitutionality of the act. *Trammell* v. *Bradley,* 37 Ark. 374, and *McClure* v. *Topf & Wright,* 112 Ark. 342, 166 S. W. 174. In both those cases the constitutionality of local liquor laws was involved. An income tax law works a great and important change in our tax laws, and is a matter of grave public interest. Besides, we think the language used by the various judges in their opinions in that case indicate their judicial interpretation of the subject after careful study of it. The views expressed were pertinent to the subject at hand, and appropriate as indicating their reasons for the conclusions announced.

In the early case of *County of Pulaski* v. *Irvin,* 4 Ark. 473, the court said:

"The power of taxation, as has been justly said, is the greatest power that can be intrusted to a sovereign. In its exercise all the great interests of society are involved, and the government is put into operation and supported by its resources or influence. As a general principle, the right of taxation is given and belongs exclusively to the legislative department. And there is great propriety and necessity in thus lodging it; for, as it is to be exercised for the benefit and security of the State, so the whole people of the State, through the means of the elective franchise, should have the power of regulating and controlling its action."

The framers of the present Constitution, in recognition of this great principle, in § 23 of the Declaration of Rights, provided that the State's ancient right of eminent domain and of taxation is herein fully and expressly conceded. The principle was announced in *Sanders* v. *Texarkana,* 103 Ark. 529, 146 S. W. 105, as follows: "Unless inhibited by some constitutional provision, the State Legislature has full power over all matters of taxation and the collection and disbursement of taxes,

and may exercise absolute control over all revenues collected by subordinate branches of the State Government. Cooley on Taxation, p. 46.''

Again, in the original opinion in the case of *Sims* v. *Ahrens,* 167 Ark. 557, 271 S. W. 720, it was said: ''In approaching the consideration of this question, it may be said that we do not have to search the Constitution for express authority to levy the tax. The power to levy it exists as an inherent right, unless the Constitution has denied the right to the State to levy taxes of this character.''

The court there considered whether the income tax was in violation of article 16, § 5, of the Constitution. The opinion of the majority of the judges was that the income tax law was in violation of that provision of the Constitution, and concludes as follows: ''The State is without power to impose an income tax or occupation tax for State purposes, and the court below was therefore correct in holding that act unconstitutional, and the decree is affirmed.''

Judge HUMPHREYS and myself concurred in the result announced, instead of dissenting from the opinion of the majority in affirming the decree, because we believed that a gross income tax operating upon all persons and occupations alike was unconstitutional. Because the majority opinion was placed upon the broad ground that, under art. 16, § 5, of the Constitution, the Legislature was prohibited from enacting any kind of income tax law, it became necessary for us to give our reasons for our disagreement to the conclusions of the majority; and, after a careful consideration of the question, and stating our reasons therefor, we said:

''Our conclusion in the whole matter is that the effect of our previous decisions that the proviso in art. 16, § 5, of the Constitution, giving the Legislature the power to tax certain occupations, by necessary implication precludes it from taxing other occupations for State purposes, and that if the provision had been left out of the section the Legislature might have taxed all occupations.

The section contains no such restriction as to income taxes. Hence, if we are correct in holding that an income tax is not a property tax, and if it is not the same thing as an occupation tax, it necessarily follows that it is within the discretion of the Legislature to pass a properly classified net income tax law.''

A motion for rehearing was filed and granted, on the votes of Justices Wood, Hart and Humphreys. Judge Wood gave his reasons for the change of views in a carefully prepared and seasoned opinion, which concludes as follows: ''Therefore, for the reasons stated, I concur in the conclusion reached by Justices Hart and Humphreys, that 'it is within the discretion of the Legislature to pass a properly classified net income tax law, and such therefore is now the opinion and holding of the majority of the court'.''

Judge Smith wrote a dissenting opinion, concurred in by Chief Justice McCulloch, which concludes as follows: ''I therefore respectfully dissent from what is now the majority opinion.''

Reference to the various opinions in that case will show that the court recognized that there was a division in the authorities upon the subject whether an income tax was a property tax or not, and we deliberately adopted the view that it was not a property tax. If it is not a property tax, it does not make any difference what name it is called. Whether it is called an excise tax, or a tax in the nature of an excise tax, or a personal tax, is a mere matter of definition, and does not in any wise change its character.

But it is again urged upon us that to hold an income tax unconstitutional because art. 16, § 5, of the Constitution, after saying that all property subject to taxation shall be taxed according to its value, etc., contains a provision that: ''The General Assembly shall have power from time to time to tax hawkers, peddlers, ferries, exhibitions and privileges in such manner as may be deemed proper,'' which they claim, by necessary implica-

tion, prohibits all forms of taxation except property taxes and the occupation taxes named in the proviso. This is in application of the maxim, *"expressio unius est exclusio alterius."* In *State* v. *Martin,* 60 Ark. 343, 30 S. W. 421, 28 L. R. A. 153, Mr. Justice Wood, speaking for the whole court, said that the court is thoroughly committed to the doctrine that the maxim "is not to be applied with the same rigor in construing a State Constitution as a statute, and that only those things expressed in such positive affirmative terms as plainly imply the negative of what is not mentioned will be considered as inhibiting the powers of the Legislature." The reason is that the Constitution of a State is not a grant of enumerated power, but its chief object is to impose limitations upon the several departments of government. If a contested enactment is not prohibited either by the letter or the spirit of the Constitution, it is authorized. *Vance* v. *Austell,* 45 Ark. 400.

The proviso in the section of the Constitution referred to gives the Legislature power to tax certain named occupations without regard to the equality and uniformity clause applicable to property. This by necessary implication prohibits the taxation of other occupations for State purposes; but at the same time it also impliedly recognizes that a tax on occupations is a different kind of tax to a property tax; and "it does not by inference too strong to be resisted," as the rule is stated in *Neal* v. *Shinn,* 49 Ark. 227, 4 S. W. 771, cut off the Legislature from levying other recognized kinds of taxes than those dealt with in the clause of the Constitution under consideration. In the application of this rule of construction in *State* v. *Handlin,* 100 Ark. 175, 139 S. W. 112, the court sustained the validity of an inheritance tax law upon the ground that it was not a property tax within the constitutional rule as to equality and uniformity. My dissent in that case was based upon the construction given to the terms of the act, and not on the ground that it was unconstitutional. Again, in *Floyd* v. *Miller Lum-*

*ber Co.,* 160 Ark. 17, 254 S. W. 450, 32 A. L. R. 811, a severance tax act was sustained as to individuals as well as to corporations, and this could not have been done if such a tax was a property tax, or if there was a prohibition by necessary implication in art. 16, § 5, against levying any kind of tax except a property tax or a tax on certain designated occupations and privileges, for only two of the judges in that case classified a severance tax as a tax on privileges. The view of the majority is that the Legislature has the power to pass a tax on net incomes, if the law is valid in other respects.

The whole matter may be summed up by a quotation from the concluding part of the opinion in *Glasgow* v. *Rowse,* 43 Mo. 479, as follows:

"The Constitution enjoins a uniform rule as to the imposition of taxes on all property, but does not abridge the power of the Legislature to provide for a revenue from other sources. It was intended to make the burdens of government rest on all property alike—to forbid favoritism and to prevent inequality. Outside of the constitutional restriction, the Legislature must be the sole judge of the propriety of taxation and define the sources of revenue as the exigency of the occasion may require. The income tax was uniform and equal as to the classes upon whom it operated. It did not come within the meaning of the term 'property' as used and designated in the Constitution, and I think was not in conflict with any provisions of that instrument."

The opinion was concurred in by the other judges.

There is no good reason for holding that inheritance tax laws and severance tax laws are not property taxes within the meaning of art. 16, § 5, of our Constitution, and that income taxes are property taxes and fall within the ban of its provisions. A majority of the court has yet to see the distinction between them. It has been well said that "a tax on incomes is not a tax on property, and a tax on property does not embrace incomes." Hence a majority of the court holds that "property," as the term

is used in art. 16, § 5, of the Constitution, means the property itself as distinguished from the annual gain or revenue from it.

It is next contended that the act is in violation of art. 5, § 31, of the Constitution, which reads as follows:

"No State tax shall be allowed, or appropriation of money made, except to raise means for the payment of the just debts of the State, for defraying the necessary expenses of government, to sustain common schools, to repel invasion, and suppress insurrection, except by a majority of two-thirds of both houses of the General Assembly."

The basis of the argument is § 41 of the act, which reads as follows:

"The commissioners shall pay to the State Treasurer, on or before the 25th day of each month, all taxes, interest and penalties collected under this act during the preceding calendar month, which amounts shall be credited by the treasurer as follows: The first $500,000 annually to the charities fund; the next $750,000 annually to common school equalization fund; and all of the remainder to a special fund to be used solely for the purpose of reducing the State tax on property."

The word "allowed" as used in that section of the Constitution means allowed by law or permitted by statute. Hence an act of the Legislature appropriating money for an exhibit of the resources of the State of Arkansas at the Panama Pacific Exposition was held not to be a necessary expense of government, and required a two-thirds majority vote of each house of the Legislature in its favor to render it valid. *Belote* v. *Coffman*, 117 Ark. 352, 135 S. W. 37, and *Oliver* v. *Southern Trust Co.*, 138 Ark. 381, 212 S. W. 77.

It is conceded that the first two items, viz., charities fund and common school equalization fund, come respectively under the phrases "defraying the necessary expenses of government" and "to sustain the common schools," but it is insisted that the concluding part of the section, providing that the remainder of the fund

be used solely for the purpose of reducing the State tax on property, amounts to a violation of the constitutional provision, because such use is not for any of the enumerated purposes in the section and is therefore in violation of the constitutional provision, because the act was not passed by a two-thirds majority vote in each house of the Legislature. A majority of the court does not agree with this contention.

It could not be foretold with any degree of accuracy how much revenue would be annually derived from the tax collected under the act, and therefore it was provided that the unexpended portion not used in the charities fund and the common school fund should be used for the purpose of reducing the State tax on property. Under the existing system of taxation, the bulk of our revenue for supporting the State Government and the common schools is raised from taxes on property. The fund so collected is placed in the general revenue fund, and is expended under appropriations made by the Legislature. If an appropriation is made for a purpose not specified in the section of the Constitution, the act must be passed by a two-thirds majority vote, as explained above. Hence the unexpended portion of the fund collected under the present act would be placed in the general revenue fund, and thereby make it practical for the proper authorities to reduce the State tax on property. The fund, however, could not be used until the Legislature appropriated it as provided by the Constitution. The appropriations would be made in the same manner as a fund collected from a property tax. That is to say, if the Legislature used it for any of the purposes not enumerated in art. 5, § 31, a two-thirds majority vote in each house would be required. In short, the unexpended portion of the fund will take the place of and be substituted for taxes collected on property, to the end that property taxes may be reduced, and the fund will be expended under appropriations of the Legislature just as property taxes are expended. The framers of the Constitution did not intend that taxes collected from different sources should require

different majorities in appropriation acts. The prohibition is directed at the purpose for which the tax is to be expended and not at the kind of taxes collected. Taxes from whatever source derived are expended under appropriations made by the Legislature in accordance with the Constitution. The concluding part of the section simply means that the unexpended portion of the tax should be substituted for a property tax of a like amount.

It is next insisted that the act should be declared invalid because the emergency clause as actually contained in the act when it passed the Legislature is not in compliance with the provisions of Amendment No. 13 of the Constitution, that there should be a statement of facts constituting the emergency in a separate clause, which should be separately adopted by a two-thirds vote. The complaint alleges that there is an emergency clause designated as § 44 of the act as approved by the Governor, which reads as follows:

"All laws and parts of laws in conflict herewith are hereby repealed. It is hereby ascertained and declared that the Hospital for Nervous Diseases is inadequate to properly care for all who should be confined therein, to the end there are many persons of unsound mind at large, who are a menace to the public safety, and that said hospital as now equipped is inadequate to restrain those insane persons who are confined therein, so that there is danger of their escaping at any time and imperil the safety of the public; that there are hundreds and hundreds of persons desiring to enter the tuberculosis sanatorium who cannot now be accommodated there, because that institution has neither rooms, beds, nor facilities for additional people, as a result said consumptives at large are spreading the disease amongst their families and friends; that the funds to be raised by this act will be used for the better care of the charitable wards of this State and to provide better for the rural schools of this State; and it is therefore ascertained and declared that it is necessary for the public peace, health and safety that this act go into immediate operation, and accordingly it is pro-

vided that this act shall take effect and be in force from and after its passage.''

The complaint alleges that the emergency clause now contained in the act was, after the passage of the act, substituted for the emergency clause which was in the act when it was passed by the Legislature, which reads as follows: ''All laws and parts of laws in conflict herewith are hereby repealed, and the urgency for immediate funds for the support of the charitable institutions of the State and the equalizing of educational opportunities, together with the urgent need of reducing the State tax on property, to the end that the expenses of government shall be borne more equally and the ownership of property may be encouraged, is so great that an emergency is hereby declared to exist, and this act shall take effect and be in force from and after its passage.''

The emergency clause which counsel for plaintiff claim was on the act when it was passed expressly states that the urgency for immediate funds for the support of these charitable institutions of the State and the equalizing of educational opportunities are so great that an emergency is declared to exist. In direct, certain and positive terms the Legislature gave its reasons for putting the law into immediate effect. The Legislature itself was the judge whether it was immediately necessary to better conditions at the State charitable institutions and to equalize educational opportunities. This it could do by its own methods of investigation and by reading the newspapers. It could find by the latter method that the urgent need of building new structures to house the insane was being discussed; that provision should be made at once to equalize the opportunities for education for those in the remote sections of the various counties with those in towns and cities. The Legislature has declared in plain language that this was an emergency or necessity for immediate action in the respects stated, which could only be accomplished by legislative action. The Constitution defines the duties of each department of government. No one would gainsay that the General Assembly must act

independently in passing such legislation as the public needs require which is not forbidden by the Constitution. In this respect it is restricted only by its sense of responsibility to the people.

Likewise its action is supreme in declaring when an emergency exists; and if it states a fact or facts constituting the emergency so that its action cannot be said to be arbitrary, the courts cannot say to it that it has or has not performed its constitutional duty. The three departments of government are of equal dignity, and no one of them can encroach upon the other. The emergency clause in the act as signed by the Governor differs in no essential respect from the one alleged to have been in the act when passed by the Legislature. Whether the facts are stated in a concise or more extended form, is a matter that concerns the Legislature alone. The courts might disagree with the Legislature about the necessity of action and be of the opinion that the facts declared did not constitute a sufficient reason for immediate action; but we are of the opinion that a declaration by the Legislature of an emergency based upon certain facts stated is conclusive upon the courts and upon all parties, in so far as it abridges the right involved in the referendum. *Hanson v. Hodges,* 109 Ark. 479, 160 S. W. 372; *Jumper v. McCollum, ante,* p. 837; and *In re Senate Resolution No. 4,* 54 Col. 262, 130 Pac. 33. Under either emergency clause the act took effect from and after its approval by the Governor. *Lee Wilson & Co.* v. *Wm. R. Compton Bond & Mtg. Co.,* 103 Ark. 452, 146 S. W. 110; *Arkansas Tax Commission* v. *Moore,* 103 Ark. 48, 145 S. W. 199; and *Hanson v. Hodges,* 109 Ark. 479, 160 S. W. 392.

No sort of proof that the substitution of an emergency clause after the passage of the bill was made by some one can of itself affect the validity of the act. If this was the law, an obnoxious law could be easily got rid of by an interested party procuring some one to alter or change it in some section or part of a section after the bill is passed. To hold otherwise would make the validity of any law depend upon the action of the parties affected

by the act, however valid the statute as passed might have been. Such a course would not only tend to unsettle all laws, but would be ruinous to the people. *Booe* v. *Road Imp. Dist.*, 141 Ark. 140, 216 S. W. 500.

It is next contended that article 2 of the act, relating to the imposition of the tax, renders the act invalid. The part specially complained of reads as follows:

"Section 3 (a) On individuals.—A tax is hereby imposed upon and with respect to the entire income of every resident, individual, trust or estate, which tax shall be levied, collected and paid annually upon such entire net income as herein computed, at the following rates, after deducting the exemptions provided in this act: On the first $3,000 of net income or any part thereof, one per cent.; on the second $3,000 of net income or any part thereof, two per cent.; on the next $5,000 of net income or any part thereof, three per cent.; on the next $14,000 of net income or any part thereof, four per cent.; on all net income in excess of $25,000, five per cent.

"(b) On corporations.—Every corporation organized under the laws of this State shall pay annually an income tax with respect to carrying on or doing business equivalent to two per cent. of the entire net income of such corporation as defined herein, received by such corporation during the income year; and every foreign corporation doing business within the jurisdiction of this State shall pay annually an income tax equivalent to two per cent. of a proportion of its entire net income to be determined as hereinafter provided in this act.

"(c) On income of Arkansas property of non-residents.—A like tax is hereby imposed and shall be assessed, levied, collected and paid, annually, at the rates specified in this section, upon and with respect to the entire net income as herein defined, except as hereinafter provided, from all property owned, and from every business, trade or occupation carried on in this State by individuals, corporations, partnerships, trusts or estates, not residents of the State of Arkansas."

See also § 16 relating to exemptions.

Having held that an income tax is not a property tax, it follows that the equality and uniformity clause of the Constitution applicable to taxes on property has no reference to income taxes, and income taxation of a progressive character does not offend § 18 of our Bill of Rights nor the Fourteenth Amendment to the Constitution of the United States, guaranteeing equal protection of the laws. While there must be no discrimination in favor of one as against another of the same class, the States may make exemptions, levy different rates upon different classes, and make such deductions as they choose, so long as they obey their own constitutions. *State v. Frear,* 148 Wis. 456, Ann. Cas. 1913A, 1147, 134 N. W. 673, 135 N. W. 164, L. R. A. 1915B, 569; and *State ex rel v. Johnson,* 170 Wis. 218, 175 N. W. 589, 7 A. L. R. 1617.

With regard to the progressive feature of an income tax, the Supreme Court of Wisconsin, in the Frear case, quoted with approval from *Knowlton* v. *Moore,* 178 U. S. 41, 20 S. Ct. 747, page 109, the following:

"The review we have made exhibits the fact that taxes imposed with reference to the ability of the person upon whom the burden is placed to bear the same have been levied from the foundation of the government. So also some authoritive thinkers and a number of economic writers contend that a progressive tax is more just and equal than a proportional one. In the absence of constitutional limitation, the question whether it is or is not is legislative, and not judicial. The grave consequences which, it is asserted, must arise in the future if the right to levy a progressive tax be recognized, involved in its ultimate aspect the mere assertion that free and representative government is a failure, and that the grossest abuses of power are foreshadowed unless the courts usurp a purely legislative function."

It is claimed that the act is discriminatory on its face between corporations and individuals. It is well settled that putting corporations in one class and individuals in another is a proper classification. The courts hold that there is a substantial difference between individ-

uals and corporations which justifies classification. A corporation is an artificial person, created by the State, endowed with franchises and privileges of many kinds which the individual has not. The tax is measured by a percentage on the net income from the business. Under § 16 different exemptions are allowed to individuals, heads of families and dependents. Foreign and domestic corporations have the same exemptions. Nonresidents are protected from discrimination, and the tax is only imposed on any business carried on within the borders of the State in the same manner as that of residents. The tax is levied and collected at the source, which is estimated from the amount of business in this State. The imposition of the tax upon business done by a nonresident in this State is no greater in any respect than that on a business conducted by a resident of the State. In *Shaffer* v. *Carter,* 252 U. S. 37, 40 S. Ct. 221, it is said:

"We deem it clear, upon principle as well as authority, that just as a State may impose general income taxes against its own citizens and residents whose persons are subject to its control, it may, as a necessary consequence, levy a duty of like character and not more onerous in its effect, upon incomes accruing to nonresidents from their property or business within the State, or their occupations carried on therein, enforcing payment, so far as it can, to the exercise of a just control over persons and property within its borders."

In *United States Glue Company* v. *Town of Oak Creek,* 248 U. S. 321, 38 S. Ct. 499, it was held that a State, in laying a general income tax upon the gains and profits of a domestic corporation, may include in the computation the net income derived from transactions in interstate commerce, without contravening the commerce clause of the Constitution. See also *People ex rel.* v. *Travis,* 231 N. Y. 339, 132 N. E. 109, 15 A. L. R. 1319.

The differences between the situation of corporations and individuals justify a difference of treatment in the levying of the income tax. The Legislature alone has the right to make the classification. It has very broad pow-

ers in this respect, and its classification will not be reviewed by the courts unless they are plainly arbitrary or discriminatory as shown on their face, or confiscatory. In *Brushaber* v. *Union Pacific Rd. Co.*, 240 U. S. 1, 36 S. Ct. 236, in discussing the question, the court said:

"In this situation it is of course superfluous to say that arguments as to the expediency of levying such taxes or of the economic mistake or wrong involved are beyond judicial cognizance. Besides this demonstration of the want of merit in the contention based upon the progressive feature of the tax, the error in the others is equally well established, either by prior decisions or by the adequate bases for classification which are apparent on the face of the assailed provisions, that is, the distinction between individuals and corporations, the difference between various kinds of corporations," etc. (Citing authorities).

As frequently said by the Supreme Court of the United States, "perfect uniformity and perfect equality of taxation, in all respects in which the human mind can view it, is a baseless dream." *Patton* v. *Brady*, 184 U. S. 608, 22 S. Ct. 493, and cases cited. As also stated by that court, it is not the province of the judiciary to inquire whether taxes of this sort are reasonable in amount, and the legislative determination is final, unless it appears arbitrary in its classification, or confiscatory.

In short, we have held that there are no constitutional restrictions in this State as to an income tax, which may be classified by the Legislature both as to the rate of taxation and the subjects as individuals, corporations, etc., if only it is uniform for each class, and of this classification the Legislature is the judge, subject only to review by the courts if the classification is palpably arbitrary.

The statute provides for a general yearly income tax. Section 4, however, provides that such tax shall first be assessed, levied, collected and paid in the year 1929 and with respect to the net income received during the calendar year 1928; provided, when the taxpayer's

income year ends on any date other than December 31, 1928, only that portion of such annual income shall be taxable under the act as is applicable to the calendar year. It is claimed that this renders the act invalid. In disc ussing this question in *Drexel Company* v. *Commonwealth*, 46 Pa. St. 31, it was held that an income tax is imposed upon profits, not capital, and that it is both constitutional and expedient, in levying the tax, to take as the measure of taxation the profits on income. of the preceding year. In *Brushaber* v. *Union Pacific Rd. Co.*, 140 U. S. 1, 36 S. Ct. 236, L. R. A. 1917D, 414, it was held that the income tax provisions of the Tariff Act of 1913 are not unconstitutional by reason of retroactive operation, the period covered not extending prior to the time when the amendment was operative. It was held further that the provision was not unconstitutional under the due process provision of the Fifth Amendment. The court quoted with approval from *Stockdale* v. *Atlantic Insurance Co.*, 20 Wall. (U. S.) 323, 331, in sustaining a provision in a prior income tax law, which was claimed to be retroactive in character, the following: ''The right of Congress to have imposed this tax by a new statute, although the measure of it was governed by the income of the past year, cannot be doubted; much less can it be doubted that it could impose such a tax on the income of the current year, though part of that year had elapsed when the statute was passed. The joint resolution of July 4, 1864, imposed a tax of five per cent, upon all income of the previous year, although one tax on it had already been paid, and no one doubted the validity of .the tax. or attempted to resist it.'' See also *People ex rel.* v. *Travis*, 231 N. Y. 339, 132 N. E. 109, 15 A. L. R. 1319, where it was held that a retroactive income tax is not invalid when applied to the business conducted by a nonresident within the State, on the theory that it is a privilege or excise tax, since it is merely a distribution of the expense of government; and *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 31 S. Ct. 342, Ann. Cas. 1912B, 1312.''

Section 42 of the act provides that, if any paragraph or part of the act shall be adjudged to be valid, such judgment shall not affect or impair the remainder of the act. This court has recognized the doctrine that, when statutes are worded in a manner to justify it, the Legislature may express its will that the provisions of such statute declared by the court to be valid shall stand, notwithstanding other provisions in the same statute may be declared unconstitutional, and that the courts will respect and carry out such legislative declaration. *Nixon v. Allen,* 150 Ark. 244, 234 S. W. 45, and cases cited.

Even if the act had not contained the section just referred to, the act, as already construed in this opinion, is complete in itself, and is severable. The general rule is that, if any special provision of an act be unconstitutional and can be stricken out without affecting the validity of the residue of the act, it will be done, and the remainder of the act will be allowed to stand. *Brooks v. Wilson,* 165 Ark. 477, 265 S. W. 53; *County Board of Education v. Austin,* 169 Ark. 435, 276 S. W. 2; and *Cone v. Garner,* 175 Ark. 860, 3 S. W. (2d) 1.

In this connection it may be stated that the act contains forty-four sections, and is very broad and comprehensive. Other objections than those here considered may be offered in the future to various provisions of the act, but we will wait to consider the questions involved in them when they are presented in a concrete case.

It follows from what we have said that a tax upon the income of a person or corporation, and not upon any particular property from which that income is derived, is constitutional; and the statute under consideration is a valid exercise of legislative power over the subject of taxation. Therefore the decree will be affirmed.

Justices SMITH, HUMPHREYS and KIRBY dissent.

HUMPHREYS, J., (dissenting). This suit was brought by appellants against appellee in the chancery court of Pulaski County to enjoin the enforcement of act 118 of

the General Assembly of 1929 of the State of Arkansas, entitled, "An act providing for the levying, collecting and paying of a tax on incomes," upon the ground that it is unconstitutional, and, even though constitutional, should be enjoined in order that it might remain in abeyance until a referendum vote of the people for and against the act may be registered. The necessary petitions to refer the act have been filed with the Secretary of State, and two years' taxes will be collected before the people can express themselves for or against it unless an injunction is issued.

According to the construction of the Constitution of 1874 in the case of *Sims* v. *Ahrens,* 167 Ark. 557, 271 S. W. 720, the General Assembly of the State may enact a properly classified, fair net income tax law. The writer was one of the majority who handed down that opinion, and, after reading the able briefs filed in the instant case by learned counsel for appellants and as *amici curiae,* I am not convinced that the majority opinion was incorrect. I am convinced, however, that the act is void for other reasons. The first reason is that the act was not passed by a two-thirds vote of both houses of the General Assembly. The journals show that it only received a majority vote. Section 31, article 5, of the Constitution of 1874 provides that:

"No State tax shall be allowed or appropriation of money made, except to raise means for the payment of the just debts of the State, for defraying the necessary expenses of government, to sustain common schools, to repel invasion and suppress insurrection, except by a majority of two-thirds of both houses of the General Assembly."

This section of the Constitution definitely specifies the only purposes for which a tax may be allowed or raised by a majority vote for both houses of the General Assembly. An act allowing a tax for any other purpose than those expressed in this act must receive a two-thirds majority vote in each house. *Belote* v. *Coffman,* 117 Ark. 352, 175 S. W. 37. One of the purposes expressed in

906

act No. 118 of the Acts of 1929 for allowing the tax is the reduction of property taxes. This purpose is clearly not within the exceptions specified in § 31, article 5, of the Constitution, and the act is void because it did not receive a two-thirds majority vote of both houses of the General Assembly.

The next reason is that the act is palpably discriminatory, unfair, and unjust. It was not ruled in the case of *Sims* v. *Ahrens, supra,* that a discriminatory net income tax law might be passed by the Legislature, but on the contrary it was ruled that the Legislature might pass a properly classified and fair net income tax law. It would extend this dissenting opinion to unusual length should the writer attempt to set out all the palpably discriminatory features in the act. I shall only set out a few of the glaring discriminations contained in the act.

According to the terms of the act, a corporation enjoying a net income of $50,000 a year would only have to pay $1,000, whereas an individual or partnership enjoying a net income of $50,000 derived from exactly the same kind of business would have to pay $2,050. In other words, an individual or partnership would be required to pay more than double the amount of taxes which a corporation would be required to pay on the basis of a $50,000 net income, where both conduct exactly the same kind of business in the same territory.

Again, the act in question is retroactive in that it imposes a net income tax upon all salaries earned in the year 1928 prior to the passage of the act. According to the terms of the act, a full year's income for the year 1928 will be collected from individuals, partnerships and corporations who operated under a calendar year, but if they operated under a fiscal year, terminating before December 31, 1928, only a portion of the 1929 income tax will be collected from them in the year 1929. This is an arbitrary and unjust discrimination which the writer cannot approve as a fair and proper classification. Just because one person uses a calendar year in estimating his income and another a fiscal year, is no justification

whatever for collecting a tax upon all of one person's income for 1928 and only a part of another's.

Again, the act makes such a difference and inequality in taxation on the sales of property that the effect will be not only to tax the income from the property but to tax the capital or property itself. A reading of § 10 of the act, together with the subsections, reveals such a difference and inequality in the taxation on sales that same is unreasonable, unfair and unjust, and necessarily void.

The writer of this dissenting opinion will not attempt to set out further discriminations in the act which render it void, but, in conclusion upon this feature of the act alone, will say that, after a very careful reading of the act, I cannot find a single tax imposed therein which is not palpably discriminatory, unjust and unfair.

Lastly, according to the view of the majority, the act is valid, but that should not prevent the issuance of a temporary injunction to restrain the enforcement thereof until a referendum vote of the people can be had thereon. This is so because, in my opinion, the emergency clause purported to be attached to the act which passed both houses of the General Assembly was an insufficient emergency clause to put the act into immediate force and effect. The Constitution, as amended, requires that facts be stated by the Legislature which constitute the emergency declared by it. This amendment was passed to prevent the evil which had grown up of attaching emergency clauses to all acts, even though an emergency did not exist. The purpose and intent of the amendment was to require the Legislature to state facts which really justified the declaration of an emergency. The emergency clause purported to be attached to the act which passed both houses of the Legislature was, in substance, like the emergency clause attached to the act which this court had before it for construction in the case of *Cumnock* v. *Little Rock*, 168 Ark. 777, 271 S. W. 466. In his dissenting opinion in that case Mr. Justice HART, now the Chief Justice of this court, said:

"Having reached the conclusion that the proviso is not self-executing, it becomes necessary for me to pass upon the validity of the act of the Legislature of 1925 attempting to put the proviso in question in operation. Section six provides that the act is immediately necessary for the preservation of the public peace, health and safety, and that the same shall take effect and be in force upon its passage. The reason given that it is declared an emergency is that, by reason of the heavy indebtedness hanging over many cities of the first class, they will be unable to procure proper facilities for the extinction of fires, proper police protection, and proper safeguards for the public health. This declaration on the part of the Legislature is a mere conclusion on its part. By an amendment to the Constitution of the State, adopted on the 11th day of November, 1920, the limitation upon the legislative power in declaring an emergency to exist is made. The section specifically provides that it shall be necessary to state the facts which constitute the emergency allowing the Legislature to put an act into immediate effect. The mere fact that cities and towns are largely in debt contains no statement of the facts of an emergency. I do not think that the legislative declaration of an emergency is final under the provision of the Constitution referred to, and am of the opinion that its action is subject to judicial review. The authorities on both sides of the question are cited in a case-note to *Payne* v. *Graham,* 118 Me. 251, 7 A. L. R. 516.''

I thoroughly agree with what the Chief Justice said in that case relative to the sufficiency of the emergency clause being a question for review by the courts and that the facts stated by the Legislature must declare real and existing facts which justify the emergency declared. The writer of this dissent is also of opinion, from an inspection of the engrossed and enrolled act before the court for construction, that it is impossible to tell whether the emergency clause, or what emergency clause, was attached to the act by a two-thirds vote of both houses of the General Assembly. It is alleged in the complaint

and conceded in the demurrer that the emergency clause to the engrossed and enrolled act was not the one attached to the original act as amended and engrossed which passed both houses of the General Assembly, but that, after the passage of the original act as amended and engrossed, the emergency clause now attached to the engrossed and enrolled act was substituted, without a vote of either house, for the one that both houses adopted and passed. Such a substitution, if made, was necessarily a fraudulent one under the allegation of the facts in the complaint. If it be conceded that the facts alleged in the complaint and admitted in the demurrer must be viewed in the light of the record, an inspection of the engrossed act reflects that the last page thereof, upon which the emergency clause appears, is written on older paper than the body of the act, and in slightly different type; and that the last page of the enrolled act upon which a part of the emergency clause appears fails to bear the red ink page number which the other pages bear in their order, and that the page next to the last one upon which the first part of the emergency clause appears is written over words which have been erased. It is true that the records in the passage of a law are the only evidences admissible to test its validity, but this rule of evidence is necessarily based upon the presumption that the records themselves are genuine, and not forgeries. If the records supporting the passage of a law are forged, the law must fall, as fraud vitiates everything, even to the highest and greatest legislative enactment. A law cannot escape the penalty of invalidity if it or a material part thereof is a fraudulent substitution for the law which actually passed both houses of the general Assembly. An inspection of the engrossed and enrolled act in question shows that the emergency clause attached thereto has been tampered with, and, in my opinion, this is enough to destroy the integrity of the emergency clause and justify a court in declaring that the act passed without an emergency clause being attached, unless it can be shown that the emergency clause

attached was the one adopted by a two-thirds vote of both houses. In the present condition of the record the court should temporarily enjoin the enforcement of the law, just as it would if no emergency clause had been adopted or attached to the act. According to the allegation of the complaint, an insufficient emergency clause was adopted and attached to the act which passed both houses of the General Assembly, and since this allegation is sustained to a great extent by an inspection of the engrossed and enrolled act, the bars should be thrown down and the truth ascertained as to the particular emergency clause which was adopted and attached to the act which passed both houses of the General Assembly.

On account of the invalidity of the act, as well as the insufficiency of the emergency clause under the allegations of the complaint and inspection of the record, the writer is of the opinion that the court should enjoin the enforcement of the act.