MORLEY, COMMISSIONER OF REVENUES *v.* REMMEL.

4-8947                                         221 S. W. 2d 51

Opinion delivered June 6, 1949.

Rehearing denied July 4, 1949.

*O. T. Ward* and *Ike Murry*, Attorney General, for appellant.

*House, Moses & Holmes* and *William M. Clark*, for appellee.

*James M. McHaney, Owens, Ehrman & McHaney, Eugene R. Warren, Bruce T. Bullion* and *Moore, Burrow, Chowning & Mitchell*, amici curiae.

FRANK G. SMITH, J. The issue in this case is whether or not Act 234 of the Acts of the 1949 session of the General Assembly increased the rate of income taxes by eliminating income taxes paid the United States Government as an allowable deduction in computing the income taxes due the State. If it did so, it was done in violation of § 2 of Amendment 19 to the Constitution and is invalid for that reason.

Amendment No. 19 was not initiated by the people under the I. and R. amendment to the Constitution, but was proposed by the General Assembly at its regular 1933 session, and was approved at the ensuing general election held Nov. 6, 1934, by a large majority. It was proposed as an amendment to Art. V of the original Constitution, which is the article dealing with the title "Legislative Department," and not as an amendment to Art. XVI, which deals with the title "Finance and Taxation." The relevant portion of the amendment is found in § 2 thereof and reads as follows:

"None of the rates for property, excise, privilege or personal taxes, now levied shall be increased by the General Assembly except after the approval of the qualified electors voting thereon at an election, or in case of emergency, by the vote of three-fourths of the members elected to each House of the General Assembly."

Act 234 of the Acts of 1949 is entitled: "An Act to Amend Act 118 of the Acts of the General Assembly of the State of Arkansas for the Year 1929; to Declare an Emergency; and for Other Purposes," which reads as follows:

"Section 1. That Subsection (c) of § 13 of Act 118 of the Acts of the General Assembly, approved March 9,

1929 (Sub-section (c) of § 14036 of Pope's Digest) is hereby amended to read as follows:

" '(c). Taxes paid or accrued within the income year, imposed by the authority of the United States or any of its possessions, or of any State, territory, or any political sub-division of any state, or territory, or the District of Columbia, or of any foreign country, except Estate, Succession or Inheritance taxes, or except income taxes imposed by this Act, and taxes assessed for local benefits of a kind tending to increase the value of the property assessed for such benefits; provided, however, that the deductions herein allowed for taxes imposed by the authority of the United States or of any of its possessions shall not include any allowances or deductions for federal income taxes paid or accrued by the taxpayer within the income year.'

"Section 2. The provisions of this Act shall be applicable to tax years on and after January 1, 1949, as the term 'tax year,' defined in Sub-section 11 of § 14025 of Pope's Digest of the Statutes of Arkansas.

"Section 3. That § 2 of Act 135 of the General Assembly, approved March 3, 1947, is hereby repealed."

Attached to this Act and as a part thereof appears in § 4 thereof an emergency clause reading as follows:

"Section 4. WHEREAS, it has been ascertained that the increased cost of living has placed heavier demands upon the funds of the State of Arkansas than are presently available, and that unless these available funds are increased and supplemented, the necessary functions of our state government are in serious danger of not providing for the necessary protection and benefit for which it is so designed and intended."

Having this emergency clause, the sufficiency of which to declare the existence of an emergency not being questioned, the Act became effective March 3, 1949, when approved by the Governor.

Section 2 of Act 135 of the 1947 General Assembly reduced the deduction on exemptions previously allowed

of the Federal income tax paid to one-half thereof, instead of the whole amount thereof which had previously been allowed as a deduction.

We have copied in full Act 234 and now, with its provisions before us, attention is called to the fact that it has not one word to say about the rate of taxes or the total amount of taxes.

The basic income tax statute of this State is Act 118 of the Acts of 1929. That act provides that in computing net income for tax purposes a deduction shall be allowed the taxpayer of all income taxes paid the United States. That particular deduction was allowed in full until 1947, when by Act 135 of the 1947 session of the General Assembly, this deduction was reduced to fifty per cent of the income taxes paid by the taxpayer to the United States. This Act was passed by a vote in excess of three-fourths of the members of both houses of the General Assembly and has not been challenged on the ground that it violated Amendment No. 19 to the Constitution. Therefore prior to 1949 all taxpayers, both corporate and individuals, were entitled to a deduction of fifty per cent of the income taxes paid the United States, in computing their state income taxes. This suit challenges the validity of Act 234 of 1949 eliminating this deduction.

Appellee, a citizen and taxpayer of this state, whose income is subject to income taxes due both the state and the Federal Government, filed with the Collector of the state income tax, a report of his income, in which he claimed as a deduction from his total income the exemption allowed by Act 135 of 1947. He was advised by the Commissioner of State Revenues that he was not entitled to that exemption or deduction, whereupon his taxes were computed after disallowing this exemption, and he paid under protest the amount demanded. Whereupon he brought this suit to recover what he alleges was the excess he was required to pay under the provisions of § 14055 Pope's Digest. Upon his appeal from the determination of the Commissioner as to the amount of taxes due, he was granted the relief prayed, and the

Commissioner was directed to return the alleged excess, and from that decree is this appeal.

In passing upon the question thus presented certain legal propositions, which are not in dispute, must be held in mind. One of these, as stated in the case of *Ouachita County v. Rumph,* 43 Ark. 525, is that the right to impose taxes upon citizens and property for the support of the state government may be restricted by the Constitution, but needs no clause to confer it.

Another is, as said in the case of *Stanley v. Gates,* 179 Ark. 886, 19 S. W. 2d, 1000, in which case it was held that the tax imposed by the Income Tax Act of 1929 was not a property tax and therefore not violative of the equality and uniformity clause of the Constitution (§ 5, Art. XVI), that unless inhibited by some constitutional provision the Legislature has power over all matters of taxation and the collection and disbursement of taxes.

Still another is that the tax may be imposed only upon the net income, which is defined as the gross income of a taxpayer, less the deductions and exemptions allowed by law.

And still another as said in the case of *Cook, Commissioner of Revenues, v. Walters Dry Goods Co.,* 212 Ark. 485, 206 S. W. 2d, 742 that, ''We think the allowance or disallowance of taxes as a deduction from net income for tax purposes, rests entirely in the legislative discretion, and exists by legislative grace, just as do exemptions.''

In other words, while only the net income may be subjected to the payment of income taxes, the power of the Legislature is plenary in prescribing how the amount of the net income may be determined, that is, what credits and deductions may be allowed or disallowed.

It is contended, however, that inasmuch as the Income Tax Act in force when Amendment No. 19 was adopted, allowed the taxpayer the full deduction of the total amount of the Federal Income Tax paid by him, he cannot be deprived of that deduction for the reason

that to do so would increase the amount of his taxes, and that this cannot be done except by a vote of the people, or by an act passed by the affirmative vote of three-fourths of all the members elected to both houses of the General Assembly.

It cannot be questioned, and is not questioned, that the effect of Act 234 will be to increase the amount of the taxes to be paid by all persons who pay federal income taxes, but that is not the question here presented, which is, whether Act 234 has increased the rate of taxes of the taxpayer.

Attention is again called to the fact that Amendment No. 19 makes no reference to the amount of taxes, and Act 234 does not refer either to the amount of taxes or the rate thereof, but deals only with the question of a deduction to be allowed in determining the net income, a subject over which, as was held in the case of *Cook* v. *Walters Dry Goods Co.,* supra, the General Assembly has plenary power. In this connection attention is called to the fact that the opinion in the Cook case just cited was delivered fourteen years after Amendment No. 19 was proposed by the General Assembly.

It is urged that the term "rate for taxes" is sufficient to include and does in fact include, amount of taxes, and it is argued that "§ 2 of Amendment No. 19 was intended to prohibit the enactment by the Legislature of any statute which would result in increasing the burden on the people of the State of Arkansas of the taxes being levied in 1934 when the Amendment was adopted", except by a vote of three-fourths of the membership.

In this connection it may be said that in the Biennial Report of the Department of Revenues for 1944-1946, which is the last published report of that department, there appear statements of the various excise taxes collected, and in the portion thereof dealing with income taxes appears this statement: "Since the low year of 1933 when only $117,000 was collected, there has been a decided increase in the collections of the Income Tax Division. Collections for the fiscal year 1945-46 which

amounted to $3,375,049.51 shows an increase of 2885% over the calendar year of 1933'', in which year Amendment No. 19 was proposed.

Of course, the greater part of this increase arose from increased income yet efficient administration of the law no doubt played a prominent part. Of all the various excise taxes collected, that from the sales tax exceeds all others. Of this tax and its collection the Commissioner says in his report (page 43) that, ''The Commissioner of Revenues is charged with the administration of the Gross Receipts Tax Law and has promulgated thirty-two supplemental regulations for the proper administration of the Law.''

Roughly speaking, taxes may be classed as general and special, and by general taxes, as ordinarily understood, is meant the taxes collected on advalorem assessments for the support of the State, the counties, the cities and towns, and the school districts thereof. These taxes are collected by the local officers.

The rate of the general taxes collected for the use and benefit of the State is fixed by the General Assembly. Other rates for general taxes are fixed by local taxing agencies clothed with that authority, and the sum total of those rates comprise the rate for the general taxes. The rate of taxes is one thing, and the assessed valuation upon which these rates are computed in determining the amount of the taxes is quite another. If one who had just come into the State, or who contemplated doing so, asked what the rate for general taxation was, he might be told that depended upon the city or town or school district, or even the county, in which the property was located, but nowhere would he be told that the rate of general taxation depended upon the assessed valuation, and he would be much surprised to receive that answer, for it would not be true. Rate applied to valuation determined the amount of the taxes, but in the common understanding one means one thing and the other something different.

Rate of taxation in common parlance means the percent of valuation taken as the tax. Valuation is the

ascertained sum to which the rate is applied and amount of taxes means the amount ascertained when valuation has been multiplied by rate.

An examination of many acts levying taxes, both general and special, since and including territorial days, shows that the above terms are used as thus defined. We will discuss some of them later.

It was said in the case of *State ex rel.* v. *Irby,* 190 Ark. 786, 81 S. W. 2d, 419, that the words of the Constitution should be given their plain, common meaning, that is as ordinarily used, and understood, unless there is something in the context to indicate a different intent. In *Ellison* v. *Oliver,* 147 Ark. 252, 227 S. W. 586, it was said that when language used in a constitutional provision is plain and unambiguous, the court cannot seek other aids of interpretation, and again, that when words are plain, clear and determinate, they require no interpretation, and it (interpretation) should be admitted if at all, with great caution and only from necessity, either to escape from absurd consequences or to guard against some fatal error. *State ex rel.* v. *Irby,* supra.

Now it must be conceded, and the concession is freely made, that there are cases in which the term rate of taxation has been used in its generic sense, rather than in the sense in which it is ordinarily employed, and in the sense in which it has been employed in this State from territorial days. In other words, the term must be interpreted in connection with the context in which it was employed.

Cases are cited in which rate of taxation and amount of taxation are used synonymously, notably cases which involved taxes on national banks.

Legislation of an early date was passed to permit taxation of national banks without discrimination against them, yet in several states they were subjected to discriminatory taxation. The leading case involving such legislation is that of *People of the State of N. Y.* v. *Weaver,* 100 U. S. 539, (10 Otto 539), 25 L. Ed. 705, in which, although the same rate of taxation was applied to

national banks as to citizens of that state having capital invested otherwise, the latter were allowed deductions denied the national banks. The legislation leading to that result was declared discriminatory and void for that reason as the same amount of taxes should have been paid in both cases on the same value. In such cases and to prevent discrimination, rate of taxation was held to mean amount of taxes that is the same amount of taxes was payable on the same value to prevent discrimination.

In the opinion in the Weaver case, supra, it was said that the Congress was conferring a power on the states which they would not otherwise have had, to tax shares of national banks, but the legislation imposing a restriction on the exercise of that power manifestly intended to prevent taxation which would be discriminatory, that is the property of the national banks should be subjected to no greater amount of taxes than was imposed on other property of the same value.

The opinion states: "As Congress was conferring power on the States which they would not otherwise have had, to tax these shares, it undertook to impose a restriction on the exercise of that power, manifestly designed to prevent taxation which should descriminate against this class of property as compared with other moneyed capital. In permitting the States to tax these shares, it was foreseen—the cases we have cited from our former decisions showed too clearly—that the State authorities might be disposed to tax the capital invested in these banks oppressively." To prevent this discrimination the court said: "This valuation, then, is part of the assessment of taxes. It is a necessary part of every assessment of taxes which is governed by a ratio or percentage. There can be no rate or percentage without a valuation. This taxation, says the act, shall not be at a greater rate than is assessed on other moneyed capital. What is it that shall not be greater? The answer is, taxation. In what respect shall it be not greater than the rate assessed upon other capital? We see that Congress had in its minds an assessment, a rate of assessment, and a valuation; and, taking all these together, the taxation on these shares was not to be greater than on other moneyed

capital''. The same purpose to prevent discrimination controls the decision of the other cases decided by the Supreme Court of the United States cited in the briefs.

Other cases are cited holding that freight rates include the total charge made for the transportation. In these and in similar cases rates would mean total charge because there is involved no question of percentage. But in taxation, rate of taxation means the percent of the assessed or ascertained valuation taken as taxes. We find no statute in our history in which it has been otherwise used.

A subdivision of the chapter on Taxation, Pope's Digest, § 13604, is entitled ''Rate of Taxation''. The general taxes for the state, for the counties thereof, and for the cities and towns therein and for all school districts of every kind are assessed as mills on the dollar and this is the rate of taxation. Note the following provisions, among others, in the following sections of the digest. ''For the support of the common schools of the state, a rate of three mills. For ex-Confederate soldiers, a tax of two mills. For state charitable institutions a rate of 1.2 mills'', and so on without exceptions as to all the general taxes. Section 13605, Pope's Digest.

Section 13607 provides that the Auditor before the meeting of the Quorum Courts throughout the State, shall certify rates of percentum for the general property tax.

Section 13611 deals with rates specified for county and school district taxes and directs that these taxes be levied as mills on the dollar.

Section 13612 deals with rates specified for cities and towns and contains the same provision.

The section next following provides that all levies of taxes in cities and towns shall be based upon the appraisement of the county assessor as equalized for the levy of state and county taxes.

An important functionary in our scheme and system of taxation has been the equalization boards, oper-

ating in each of the counties, and by § 13645, Pope's Digest, it is provided that "It (the equalization board) shall raise or lower the valuation of any property to such figure as in the opinion of the board will bring about a complete equalization." Other and recent legislation which we shall not review, is designed to equalize valuations, not only within each particular county, but between the counties of the state. It is submitted that if the decree from which is this appeal correctly construes our revenue laws as meaning that rate of taxation means amount of taxes, and can be changed only by a vote of the people, or by a three-fourths vote of the General Assembly, our equalization laws may be impaired, if not invalidated. Equalization could mean raising as well as reducing assessed values, with the consequent increase or decrease in the amount of taxes paid, and our equalization laws authorize that action.

Section 13653, Pope's Digest, provides rules for valuation of property for purposes of taxation, compliance with which might well increase many assessments of value. May these rules so stated be changed only by a vote of the people or upon the approval of three-fourths of the General Assembly?

In addition to the general taxation to which we have just referred taxes are now derived from some sixty odd other sources, principally excise taxes. These are assessed in some instances at so much per yard, or pound, or gallon or ton, etc., but in all instances when based upon valuation they are assessed at a certain rate percentum thereof. As typical of all others take the income taxes with which we are specifically dealing. Section 14026, Pope's Digest, provides that this tax shall be levied, collected and paid annually at a given percentum of the ascertained net income. This rate increases as net income increases, but whatever the income, the tax is a percent thereof.

This percentum, whatever it may be, is the rate of taxes and Act 234 makes no changes therein, indeed as has been said makes no reference thereto.

The construction of Act 234 given by the court below, makes it mean what it would have meant if it had provided that "the amount of taxes now paid shall never be increased" or the basis thereof changed, if any increase of taxes results from the change except by vote of the people or with the approval of three-fourths of the membership of the General Assembly. The language employed does not admit of that construction. It is contrary to our system of levying taxes and to the general understanding of the words employed, to say that rate of taxes means amount of taxes. As a practical matter, it seems highly improbable that the General Assembly in proposing the amendment intended that all future sessions of the General Assembly should be deprived of the power to legislate as to deductions and exemptions which might increase the amount of some of the various existing taxes, except by a vote not of a majority of its membership, but by three-fourths vote thereof.

In our opinion Act 234 is valid legislation and the decree of the court below will be reversed and the complaint of appellee will be dismissed.

Justices Holt and George Rose Smith, dissent.

HOLT, J., dissenting. I respectfully dissent. The question which we are considering is whether Act 234 of 1949 was constitutionally adopted by the General Assembly in view of § 2 of Amendment 19 of our Constitution, which provides: "Section 2. None of the rates for property, excise, privilege or personal taxes, now levied shall be increased by the General Assembly except after the approval of the qualified electors, voting thereon at an election, or in case of emergency, by the vote of three-fourths of the members elected to each House of the General Assembly."

This Amendment was submitted to the people by the 1933 Legislature and overwhelmingly adopted in 1934 by a vote of 99,223 for, and 25,496 against.

It is undisputed that Act 234 did not receive the vote of three-fourths of the members of the House and Senate.

A solution of the question presented depends upon the meaning of the term "rates" as used in the Constitution and the Income Tax Statute. I think, from the authorities presently referred to, it will be shown that the word "rate" is a most flexible term, depending for its meaning upon the context in which it is used and the result intended to be accomplished by the constitutional provision and statute in which it appears.

As used here, I think that we should hold that it means all the facts embraced in computing the overall rate of the tax, as valuations, exemptions, deductions and percentages, and in order to find the rate, all elements which produce it must be taken into account.

The term "rate" has been variously defined as meaning a tax or assessment; a sum assessed as a tax; a public valuation or assessment of every man's estate; also a percentage upon the valuation of land. The term may apply either to the percentage of taxation or to the valuation of property, or it may refer to the assessment, the rate of assessment, and the valuation taken together." 52 C. J. 1142.

"Bouvier's Law Dictionary, Eighth Edition, defines 'rate' as 'A public valuation or assessment of every man's estate; or the ascertaining how much tax everyone shall pay'."

In *Towne* v. *Eisner*, 245 U. S. 418, 38 S. Ct. 158, 62 L. Ed. 372, L. R. A. 1918D, 254, (1918), Mr. Justice HOLMES said: "A word is not crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

The Supreme Court of the United States in *Boyer* v. *Boyer*, 113 U. S. 689, 5 S. Ct. 706, 28 L. Ed. 1089, held that the term "rate" included "the entire process of assessment * * * includes both their valuation and the rate of per cent on such valuation," and if anyone of these items is so changed as to increase the tax, then the tax rate has been increased.

Our National Bank tax cases appear to hold uniformly that the provision that State taxes on National Bank shares shall not be at a "greater rate" than that assessed on other monied capital has reference to the entire process of taxation, including valuation of shares as well as the percentage charged on the valuation. *New York* v. *Weaver,* 100 U. S. 539, 22 L. Ed. 705 (1880); *Pelton* v. *Commercial Nat'l Bank,* 101 U. S. 143, 25 L. Ed. 901 (1880); *Boyer* v. *Boyer,* 113 U. S. 689, 28 L. Ed. 1089 (1885); *Stanley* v. *Albany County,* 121 U. S. 535, 7 S. Ct. 1234, 30 L. Ed. 1000; *Des Moines National Bank* v. *Fairweather,* 263 U. S. 103, 44 S. Ct. 23, 68 L. Ed. 191 (1923); *Central Nat'l Bank* v. *Lynn,* 259 Mass. 1, 156 N. E. 42 (1927); *First Nat'l Bank* v. *Dawson County,* 65 Mont. 321, 213 Pac. 1097 (1923); 59 A. L. R. 18.

In *State* v. *Wiley,* 177 Wash. 65, 31 P. 2d 539, it was contended that an act was unconstitutional since the word "rate"as used in the Constitution did not include valuation but percentage or millage only. In holding that the constitutional provision should not be construed so narrowly, the court said: "As we read the proviso, the key to its interpretation—if interpretation is needed—is the word 'rate'. The word has various meanings, dependent upon its relation to subject-matter and context. It may mean measure, valuation, proportion, or percentage. In relation to taxation, it is used in the sense of valuation or percentage. *State* v. *Utter,* 34 N. J. Law 489; *Coventry Co.* v. *Assessors,* 16 R. I. 240, 14 A. 877; *Lake County* v. *Schroeder,* 47 Or. 136, 81 P. 942; *Ankeny* v. *Blakley,* 44 Or. 78, 74 P. 485. We think the word is used here in the sense of both valuation and percentage."

Section 14030, Pope's Digest, defines net income as "the gross income of the taxpayer less the deductions allowed by this act."

Obviously any change in deductions as attempted by Act 234 here, brings about changes in net income which necessarily changes the rate as specified in § 14026, Pope's Digest, by eliminating federal income tax deductions. Act 234 necessarily, it seems to me, raises the income tax rate, a result prohibited by Amendment 19, in

the absence of a three-fourths affirmative vote of both Houses of the Legislature.

There are two well established rules in construing a constitutional provision:

(1)

The first is to determine the meaning and intention when the electors adopted it. To that end, we should look to the history of the times and examine the conditions and state of things existing when the amendment was adopted. Purpose should always prevail over the letter and a reasonable construction should be placed upon it to the end that the object of the people may not be defeated. *Ragsdale* v. *Hargraves,* 198 Ark. 614, 129 S. W. 2d 967, 123 A. L. R. 993; *Bailey* v. *Abington,* 201 Ark. 1072, 148 S. W. 2d 176, 149 S. W. 2d 573.

In *Lybrand* v. *Waafford,* 174 Ark. 298, 296 S. W. 729, this court said: ''It is settled by very high authority that, in placing a construction on a constitution, or any clause or part thereof, a Court should look to the history of the times, and examine the state of things existing when the constitution was framed and adopted, in order to ascertain the old law, the mischief and the remedy. Constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of their adpotion and the general spirit of the times and the prevailing sentiments among the people,'' and in *Bailey* v. *Abington, supra,* we said: ''The Court, therefore, should constantly keep in mind the object sought to be accomplished by its adoption and the evils, if any, sought to be prevented or remedied. Effect should be given to the purpose indicated by a fair interpretation of the language used. The intent may be shown by implication as well as by express provisions.''

With these principles in mind, let us review briefly the situation confronting the people of Arkansas when Amendment 19, *supra,* was enacted.

In 1934, we take judicial notice of the fact that this State, (along with all the others in the Union), was in the throes of the most calamitous depression perhaps in

the history of this Country. There was general unemployment, bread lines were forming, banks were failing, money difficult to obtain, and many of the most thrifty of our people were unable to pay their debts. The Legislature was called in special session to enact moratorium laws of various types, including restrictions on the right to foreclose mortgages and to allow the property owner to pay his taxes by piece meal.

Can it be said that in these circumstances the people intended, by Amendment 19, that their taxes might be increased by our lawmakers directly or indirectly short of a three-fourths vote in both Houses.

It is undisputed that the effect of Act 234 is to increase the income tax of every person who pays a Federal income tax, in fact, it appears to be undisputed that the purpose of this act was to increase and that it will increase the income tax payments on Arkansas taxpayers to the extent of a total of $2,500,000 or more annually.

I think it is obvious that the people had no such intention, that is to make it possible for their taxes to be increased by their deliberate and overwhelming approval of Amendment 19.

(2)

If, under the above rules and authorities, this court should have any doubt about the construction which should be placed upon Amendment 19 and the tax statute, any such doubt must be resolved in favor of the taxpayer. We have repeatedly so held.

"A statute imposing a tax must be strictly construed against the taxing authority. A tax cannot be imposed except by express words indicating that purpose." (*Cook* v. *Ark.-Mo. Power Co.,* 209 Ark. 750, 192 S. W. 2d 210). See also, *Little Rock* v. *Corporation Commission,* 209 Ark. 18, 189 S. W. 2d 382; *Moses* v. *McLeod,* 207 Ark. 252, 180 S. W. 2d 110;; *McLeod* v. *Commercial National Bank,* 206 Ark. 1086, 178 S. W. 2d 496, and *McCain* v. *Crossett Lumber Co.,* 206 Ark. 51, 174 S. W. 2d 114.

To sum up, I submit that the term "rates" as used in Amendment 19 and the income statute, Act 234, in-

cludes the whole tax formula. Act 234, by disallowing any deductions to the Arkansas income taxpayer on his Federal income tax payment, so changes the meaning of net income as to increase the tax rate and the taxes of every taxpayer in Arkansas who pays a Federal income tax.

The decree of the trial court, in my opinion, should be affirmed.

GEORGE ROSE SMITH, J., dissenting. I should like to add a few words to Justice HOLT's thorough analysis. I think the basic fallacy in the majority opinion lies in the fact that the Constitution is being interpreted as if it were a statute. In matters of statutory construction the courts recognize the legislators' skill in the preparation of laws and their familiarity with the meaning of legal terms. Hence it is perfectly proper for a statute to be construed in the light of existing laws and court decisions. But here the question is not one of statutory construction. "We must never forget that it is *a constitution* we are expounding."

Our problem is to determine the intention of the electorate in adopting Amendment 19. In this view, much of the majority opinion is seen to be irrelevant. It is true that several of our tax laws use the word "rate" in a technical sense, but the average voter does not bring to the polls the legal knowledge of a tax consultant. His knowledge of the Amendment was derived from reading its provisions or the summary that appeared on his ballot. The whole purpose of the Amendment, as disclosed by each of its five sections, was to restrict the cost of government and the expenditure of public funds. The Amendment limits appropriations to the sum of $2,500,-000 in each biennium and prohibits any increase in existing rates of taxation, with a proviso permitting the General Assembly to exceed either limitation by a three-fourths vote. The taxpayers will be dismayed to learn that in spite of their efforts to curb State expenditures a majority of the legislature may now increase their taxes in innumerable ways, as long as the rate—as that term is sometimes used in law books—is not raised.

This conception of "rate" is actually an incomplete idea, as it necessarily involves a ratio between two separate factors. So close is the interplay between the two factors that the meaning of each is dependent upon that of the other. If the Constitution prohibited any increase in the rate of speed upon the highways in excess of sixty miles an hour, I do not suppose the legislature could evade the prohibition by declaring that an hour shall henceforth consist of thirty minutes. So in this case, the ratio is between a percentage factor and the amount of net income. The scope of each is affected by the meaning of the other. To say that the income tax rate is from one to five per cent is not informative unless we also know the amount of the exemption, the permissible deductions, the brackets for each percentage rate—in short, the entire income tax structure. It does not take a mathematician to see that the amount of the tax depends just as directly upon the method of computing net income as it does upon the so-called rate. For example, the income tax exemption in 1934 was $1,500 for a single person. The court now holds that a majority of the legislature may abolish the exemption altogether, so that a person who would formerly have paid no tax at all will be compelled to pay upon every penny of his earnings. He will receive with some skepticism the majority's assurance that the *rate* of his tax has not been increased in the slightest degree. In like manner the taxpayer who was in the 1% bracket may be moved into the 2% bracket by a change in exemptions or deductions, but still this is said not to involve a change in his rate. There is no need to multiply examples. I am convinced that the average voter approved Amendment 19 in the reasonable belief that it would restrict any change in the tax structure that is designed to levy an increased tax upon a given amount of income, property valuation, or other source of public revenue. I think that by disregarding this fact the majority have emasculated an important provision of the Constitution.