ACW, INC.; Phillips Development Corporation; and United Wholesale Florists, Inc., On Behalf of Themselves and All Others Similarly Situated *v.* Richard WEISS, Director of Department of Finance & Administration, and John Theis

96-894                                                     947 S.W.2d 770

Supreme Court of Arkansas
Opinion delivered June 30, 1997

[Appellants' petition for rehearing denied September 11, 1997*; appellees' petition for rehearing denied September 11, 1997.]

---

\* GLAZE, J., would grant.

*Timothy Davis Fox, Richard E. Holiman,* and *Gregory M. Hopkins,* for appellants.

*Beth Briscoe Carson,* Chief Counsel, for appellees Richard A. Weiss and John H. Theis.

RAY THORNTON, Justice. Appellants are the named plaintiffs in a certified class of approximately 3,100 corporations seeking a refund of corporate income taxes levied by Act 1052 of 1991. Each of the named plaintiffs, ACW, Inc.; Phillips Development Corporation; and United Wholesale Florists, Inc., filed Arkansas state income-tax returns reporting Arkansas net taxable income in excess of $100,000. Each paid corporate income tax at the flat rate of $6\frac{1}{2}\%$ on their entire net income. After seeking refunds individually, the named plaintiffs filed a verified claim for repayment of overpayment of taxes on their first $100,000 of net taxable income, on behalf of themselves and others similarly situated. They contended that the proper assessment would be a graduated rate on the first $100,000, as is applied to corporations with net taxable income of $100,000 or less.

After exhausting their administrative remedies, appellants filed a complaint in chancery court, which alleged: (1) Act 1052 violates the provisions of Ark. Const. art. V, § 38; (2) the Act requires application of graduated rates on the first $100,000 of income, or in the alternative, that it is ambiguous; (3) if the Act unambiguously levies a 6½% flat rate on the first $100,000 of income, it violates equal protection; (4) the Act results in a confiscatory tax. They requested class certification pursuant to Ark. R. Civ. P. 23 and Ark. Const. art. XVI, § 13, and asked for refunds, injunctive relief, and the establishment of a common fund.

The trial court granted class certification, but affirmed the decision of the Commissioner imposing the flat rate and denied the requested relief. It found that the Act was subject to the provisions of Ark. Const. art. V, § 38, which requires that the passage of the Act be a response to an emergency allowing the imposition of such a tax by a three-fourths vote of each House of the General Assembly, and that an emergency had been stated. Regarding the ambiguity argument, the trial court acknowledged that the language of the statute could be read to reach three divergent results, but concluded that the interpretation offered by appellees, the Department of Finance and Administration and the Commissioner of Revenues, should prevail. Finally, the court found that the statute did not violate equal protection.

On appeal, appellants contend that (1) there was not an emergency allowing the passage of the tax as provided by Ark. Const. art. V, § 38; (2) the statute is ambiguous and should be resolved in favor of the taxpayer; and (3) the Department's interpretation of the Act results in a confiscatory tax and violates equal protection. We agree with the trial court's finding that the requirements under the Arkansas Constitution for adoption of the statute had been met, and affirm on this point.

While we agree with the trial court's finding that the statute could be read to reach divergent results, we disagree with its ruling that the Department's interpretation should prevail; and we reverse on this point.

Finally, we consider appellees' cross-appeal, contending that the doctrine of sovereign immunity invalidates the certification of

a class of taxpayers seeking refunds in this case. On the basis of our recent decisions in *State v. Tedder*, 326 Ark. 495, 932 S.W.2d 755 (1996), and *State v. Staton*, 325 Ark. 341, 942 S.W.2d 804 (1996) (substituted opinion granting rehearing), we agree with appellees that no class certification should have been ordered, and reverse the certification.

### The Existence of an Emergency

We first address the trial court's determination of the existence of an emergency. Appellants argue that the tax imposed by Act 1052 of 1991 must fail because it was not a response to an emergency allowing passage of the tax by the votes of three-fourths of the members of each house of the General Assembly. We agree with the trial court that the emergency clause did state an emergency sufficient to meet the requirements of the Arkansas Constitution under art. V, § 38. Section 9 of Act 1052, the emergency clause of the Act, provided the following:

> It is hereby found and determined by the General Assembly that additional funds are necessary to provide higher quality educational programs which are accessible by all segments of the population in the state; that recent studies have shown that in the year 2000, workers must have a minimum of fourteen (14) years of education to function in the work force; that the state is in desperate need of training, retraining and upgrading the work force; that this act will provide the funding necessary to provide every citizen with an opportunity to participate in vocational-technical training or college transfer programs; and that it is necessary for this act to become effective immediately to provide the funding needed for these programs as soon as possible. Therefore, an emergency is hereby declared to exist and this act being necessary for the immediate preservation of the public peace, health, and safety shall be in full force and effect from and after its passage and approval.

For a thorough understanding of the provisions and requirements of Ark. Const. art. V, § 38, a brief review of its historical background is required. At the time the article was adopted as Amendment 19 in 1933, Arkansas was in the throes of financial emergency. More than 165 million dollars of highway and road improvement bonds were in default, and checks drawn on the

state treasury were nearly worthless. The regular session of the General Assembly of 1933 cut state spending in half, established a sinking fund to pay off checks, and proposed a constitutional amendment limiting the issuance of bonds or other evidence of indebtedness. That amendment, together with Amendment 19, were proposed by the legislature, and adopted by overwhelming majorities at the general election on November 6, 1934.

Among its other provisions, and with a notable exception for paying the just debts of the state, Confederate pensions, and expenditures for educational and highway purposes, Amendment 19 prohibited expenditures exceeding two and one-half million dollars during any biennial period "unless approved by the votes of three-fourths of the members elected to each House of the General Assembly."

Amendment 19 also provided that:

> None of the rates for property, excise, privilege or personal taxes, now levied shall be increased by the General Assembly except after the approval of the qualified electors voting thereon at an election, or in case of emergency, by the votes of three-fourths of the members elected to each House of the General Assembly.

We observe that this amendment does not require either an emergency or an extraordinary vote to adopt new classes of taxes. The limitations of the amendment apply only to increased rates for property, excise, privilege, or personal taxes in existence at the time the amendment was adopted. Other taxes, such as sales and use taxes, or other means of increasing revenues, such as the repeal of deductions applicable to the computation of tax liabilities on income taxes, may be adopted without any declaration of emergency, and without an extraordinary majority vote. For example, while we have decided that higher rates of income taxes are included in the class of taxes requiring an extraordinary three-fourths majority for adoption under Amendment 19, *Hardin v. Fort Smith Couch & Bedding Co.*, 202 Ark. 814, 152 S.W.2d 1015 (1941), we have also determined that a three-fourths vote is not necessary to repeal a deduction or an exemption from federal taxes

used in computing state income taxes, *Morley v. Remmel*, 215 Ark. 434, 221 S.W.2d 51 (1949).

The selective targeting of certain specific classes of tax increases by Amendment 19 may perhaps express a preference for other means of raising revenues, but does not establish a public policy opposed to raising revenues for significant and appropriate public purposes, such as education, highways, and the payment of public debts. To the contrary, the public policy of our state clearly favors sustaining public schools and defraying necessary expenses of government. For example, as long ago as 1927, we held that the maintenance of institutions of higher education was a necessary expense of government that did not require an extraordinary majority vote from both houses of the General Assembly. *Hudson v. Higgins*, 175 Ark 585, 299 S.W. 1000 (1927).

In a long line of cases interpreting emergency clauses adopted in accordance with Amendment 7's provision on initiative and referendum matters, we have given great deference to legislative determination whether an emergency exists. Such emergency clauses must state not only a grave problem, but because the effect of the clause is to allow an act to become effective upon passage, there must also be a showing of a need to promptly begin a response to the circumstances that have generated the emergency. However, it is not essential that the emergency be suddenly discovered or that the remedy be immediately effective. In *Priest v. Polk*, 322 Ark. 673, 912 S.W.2d 902 (1995), we pointed out that the revision of our state's Constitution was properly described as an emergency, even though the problems were not recently discovered, and the remedies would not bring immediate results. The following reasoning articulated by U.S. District Court of Oregon in *Daugherty Lumber Co. v. United States*, 141 F.Supp. 576 (1956), is useful for our consideration:

> Legislative emergencies are those situations where the common good or public interest is legislatively declared to be paramount to individual interests. Common knowledge tells us that legislative action effective immediately, has on legion occasions been adopted to correct an adverse public interest of long standing.

*Id.* at 581.

■ Emergency legislation is enacted for the purpose of alleviating grave conditions. Norman J. Singer, *Sutherland Statutory Construction* § 71.06, at 282. If legislation shows a remedial purpose, it will be given generous construction. *Id.* As another court stated, the *facts* must show a necessity for immediate action. *Osage Outdoor Advertising v. State Highway Comm'n*, 687 S.W.2d 566 (Mo. App. 1984).

■ Statutes are presumed constitutional, and the burden of proving otherwise is upon the challenger of the statute. *Ports Petroleum Co. v. Tucker*, 323 Ark. 680, 916 S.W.2d 749 (1996). Here appellants bear the burden of proving that there was no emergency.

We recognize that it may require many years of inadequate support of education before there is a legislative realization of an emergency that has resulted from the economic and societal impact of that inadequate education. We also observe that educational problems cannot be corrected immediately. As expressed by the emergency clause in Act 1052, the goal is to provide access to all segments of the population so that fourteen years of education is available by the year 2000. We note that the length of time required to address the problem is in itself a strong and rational basis for getting started toward a solution.

■ In light of the history of Ark. Const. art. V, § 38, and the expressed public policy of our state, we hold that an emergency existed, enabling the General Assembly to pass the Act by the extraordinary vote of three-fourths of the entire membership of each house of the General Assembly.

■ We have also considered appellants' argument that the measure must fail because 3% of the revenues will be allocated to the Constitutional Officers Fund and the State Central Services Fund. The application of revenues to be derived from this tax is subject to review and legislative action during the years in which the revenues are realized. Some overhead costs can be expected, and as pointed out by the trial court, once the threshold question of the existence of an emergency is resolved, the trial court lacked the authority to substitute its priorities for those expressed in the statute.

■ Finally, it should be emphasized that the adoption of an emergency clause does not deprive the people of their rights to refer any measure to a popular vote. *Jumper v. McCollum*, 179 Ark. 837, 18 S.W.2d 359 (1929).

### Statutory Interpretation

Appellants next urge that even if the passage of Act 1052 met the requirements of art. V, § 38, its application by appellees either reflects a misinterpretation of the language of the Act, or in the alternative, results in an unconstitutional levy of a confiscatory tax, as well as the imposition of arbitrarily unequal taxation in violation of state and federal equal protection guarantees.

Each appellant filed Arkansas state income-tax returns reporting Arkansas net taxable·income tax in the excess of $100,000.00 per year. Each paid corporate income tax at the flat rate on their entire net income. Each sought refunds, contending that the correct tax liability should be based on a graduated tax rate of 1% up to 6% on the first $100,000.00 of net income, identical with that applied to corporations having a net income of $100,000.00 or less; and that the final bracket of 6½% should apply, "on net income exceeding $100,000.00. . . ." Appellees contend that the statute creates two distinct classes of taxpayers, those making $100,000.00 or less, and those making $100,000.50 or more, and that those in the second group are required to pay more taxes on their first $100,000.00 of income than required of those in the first group.

Act 1052 of 1991, codified at Ark. Code Ann. § 26-51-205 (Repl. 1992), provides as follows:

> (a) Every corporation organized under the laws of this state shall pay annually an income tax with respect to carrying on or doing business on the entire net income of the corporation,. . .received by the corporation during the income year, on the following basis:
>
> (1) On the first $3,000 of net income or any part thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1%
> On the second $3,000 net income or any part thereof . . 2%
> On the next $5,000 of net income or any part thereof . . 3%
> On the next $14,000 of net income or any part thereof . 5%

> On the next $75,000 of net income or any part thereof, but
> not exceeding $100,000 ............................ 6%
> (2) On net income exceeding $100,000, a flat rate of six and one-
> half (6½ %) percent shall be applied to the entire net income.

Similar language in subsection (b) applies to foreign corporations.

We agree with the trial court's statement that "the language set fourth in the subsection (a)(2) . . . when read in conjunction with sections (a)(1) . . . can be read to reach any of the three results set forth in the plaintiff's exhibit no. 35."

There is absolutely no language in section (a)(1) to indicate that any corporation shall pay any tax on the first $100,000 of net income other than the graduated taxes provided by that section. To the contrary, the statute provides the following: "Every corporation. . .shall pay. . .on the following basis:" and then sets out the graduated schedule that clearly applies to all corporations. Without any reference to the clear and unambiguous schedule of (a)(1), the first phrase of the next sentence reads as follows: "(2) On the net income exceeding $100,000, a flat rate of . . . 6½% shall be applied. . . ."

We note that until this point in the statute, the interpretation remains unambiguous, but the next five words render the statute ambiguous. Those words are ". . .to the entire net income." We are next told by appellees that those words take precedence over the language of (a)(1) and repeal the graduated scale of taxes contained in that section, with the effect that the taxpayer is charged with a 6½% tax applied "to the entire net income. . . ." However, this interpretation becomes even more strained when the same words in the section dealing with foreign corporations must be interpreted as meaning something other than "the entire net income."

■ We have determined that a statute is ambiguous where it is open to two or more constructions, or where it is of such obscure or doubtful meaning that reasonable minds might disagree or be uncertain as to its meaning. *City of Little Rock v. Arkansas Corp. Comm'n*, 209 Ark. 18, 189 S.W.2d 382 (1945). We hold that the statute before us is internally inconsistent and ambiguous.

When a statute is ambiguous, we must give effect to the legislative intent. *Omega Tube & Conduit Corp. v. Maples*, 312 Ark. 489, 850 S.W.2d 317 (1993). Therefore, our review now turns to an examination of the whole Act, reconciling provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part. *Id.* at 493, 850 S.W.2d at 319. To determine legislative intent, this court looks to such appropriate matters as the legislative history, the language, and the subject matter involved. *Id.* at 495, 850 S.W.2d at 320. The manner in which a statute has been interpreted by executive and administrative officers may also be considered, and will not be disregarded unless clearly wrong. *Id.*

Following the adoption of Act 1052, the official Arkansas Legislative Tax Handbook prepared by the Legislative Council of the Arkansas General Assembly for the years 1992-93 and 1994 set out the corporate income taxes as enacted by the Act 1052, as follows:

| | |
|---|---|
| On the first $3,000 of net income ..................... | 1% |
| On the second $3,000 of net income ................. | 2% |
| On the next $5,000 of net income .................. | 3% |
| On the next $14,000 of net income .................. | 5% |
| On the next $75,000 of net income but not exceeding $100,000 ......................................... | 6% |
| On all net income in excess of $100,000 .............. | 6.5% |

In a further reference to the effect of Act 1052 of 1991, the handbook contained the following: " Act 1052 of 1991 — the 6.5% applies to the entire net income over $100,000."

We note with interest that the 1991-1993 Official Biennial Budget of the State of Arkansas, prepared by the director of appellee, Department of Finance and Administration, as abstracted at page 9, contains the following summary on page 16: " Act 1052 – Increases the corporate income tax on corporations with net income exceeding $100,000. The new tax is a flat 6.5% on the net taxable income that exceeds $100,000."

The above official documents suggest that the legislative intent was to impose a flat tax of 6½% only on income in excess of $100,000. Notwithstanding these earlier interpretations of the

Act, the Department finally decided that the 6½% tax rate repealed the graduated schedule for the first $100,000 of net income and replaced it with the higher 6½% levy. The result is that like the statute itself, the executive and administrative interpretations show that reasonable minds could differ and that the statute is clearly ambiguous.

We have often stated that a tax cannot be imposed except by express words indicating that purpose, and that any ambiguity or doubts must be resolved in favor of the taxpayer. *Leathers v. Active Realty Inc.*, 317 Ark. 214, 876 S.W.2d 583 (1994). Based upon our review of the legislative intent and consistent with our own decisions relating to the interpretation of tax measures, we find that the statute imposes a graduated tax applying to all corporations for the first $100,000 of net income, and a flat tax of 6½% on the entire net income above $100,000. The uniform application of tax rates on all corporations resolves the issues of confiscatory taxation and alleged violations of equal protection guarantees.

*Class Certification*

Appellees argue on cross-appeal that because there was no waiver of sovereign immunity, the chancellor lacked authority to certify the members of the class that did not file refund claims. We agree, and reverse the order granting class certification.

Our constitution prohibits suits against the state, Ark. Const. art. V, § 20; however, this sovereign immunity may be waived in certain limited circumstances. *State v. Staton*, 325 Ark. at 344, 942 S.W.2d at 805. The legislature allows a taxpayer to sue the state for an improperly collected tax only after that taxpayer has requested a refund and that request has been denied. Ark. Code Ann. § 26-18-507(e)(2)(A) (Repl. 1992). In *State v. Tedder*, 326 Ark. at 496, 932 S.W.2d at 756, we determined that only the taxpayer who has requested and has been denied a refund under this statutory provision has obtained a waiver of sovereign immunity. "A trial court acquires no jurisdiction where the suit is one against the State and there is no waiver of sovereign immunity." *State v. Staton*, 325 Ark. at 344, 942 S.W.2d at 805.

In the instant case, only the named plaintiffs have followed the procedure outlined in Ark. Code Ann. § 26-18-507(e)(2)(A) by applying for a refund. Under our prior holdings, the named plaintiffs are the only persons for whom sovereign immunity has been waived. Therefore, the order granting class certification must be reversed.

### Conclusion

In sum, we hold that Act 1052 of 1991 meets the requirements of art. V, § 38 of the Arkansas Constitution. We observe that its ambiguous language can be reconciled into a consistent, harmonious, and sensible interpretation that provides the same graduated tax rates upon the income of all corporations, both foreign and domestic. We hold that the statute, so interpreted, does not violate constitutional provisions of equal protection; and finally, we hold that the doctrine of sovereign immunity bars the certification of a class of taxpayers to seek refunds of taxes.

We affirm in part, and reverse and remand in part for further proceedings consistent with this opinion.

NEWBERN and GLAZE, JJ., dissent.

BROWN, J., dissents in part concurs in part.

ROBERT L. BROWN, Justice, concurring in part and dissenting in part. I agree with the majority's opinion on direct appeal, but I would affirm the cross-appeal.

The court's decision with respect to the cross-appeal gives the plaintiffs in this case a hollow victory and repeats the mistake that was made in the substituted opinion in *State v. Staton*, 325 Ark. 341, 942 S.W.2d 804 (1996). My dissent in that case foretold that this precedent would work to deny taxpayers who had been assessed an illegal tax the only viable remedy to reclaim those taxes. As an example, it is estimated in this case that individual corporations have $1,060 at risk in this litigation. It would be cost-prohibitive for a corporation to take on the expense of filing the administrative claim, and then upon denial of that claim, to pursue relief through the trial court and on appeal. The bottom line is that the State has every motivation to take the most aggres-

sive stance on a given tax statute, for it is now a virtual certainty that even the most extreme interpretation will reap the bounty of illegal tax revenue.

Our decision in *Staton* hinged on the notion that sovereign immunity protects the State from the consequences of its illegal actions and also on the porous premise that class actions will bankrupt the State. As I stated in my dissent in *Staton*, sovereign immunity was sufficiently waived by the General Assembly by its enactment of Ark. Code Ann. § 26-18-507 (Repl. 1992); hence, the voluntary payment rule is of no consequence in light of this refund statute. Moreover, the State will not be pushed toward bankruptcy with these class actions. Individual taxpayers still would have to prove their claims should the tax interpretation be decided in their favor.

A class action is the only practical way to remedy many illegal taxes like the one before the court today, because only the most civic-minded citizen would undertake the arduous burden of obtaining judicial relief when the recovery could only be nominal at best. The death of *Pledger v. Bosnick*, 306 Ark. 45, 811 S.W.2d 286 (1991), has left the taxpaying families and companies of this State subject to the will of the Department of Finance and Administration without a remedy. I would permit the class action to proceed.

TOM GLAZE, Justice, dissenting. I must dissent. In my view, the majority decision is disturbing precedent and bodes trouble for Arkansas taxpayers. In short, I submit that Act 1052 of 1991 is unconstitutional because it was enacted contrary to Article 5, Section 38, of the Arkansas Constitution, as amended by Amendment 19.

First, it must be kept in mind that the Arkansas Constitution is a limitation upon and not a grant of power to the legislature. *Erxleben v. Horton Printing Co.*, 283 Ark. 272, 675 S.W.2d 638 (1984). As previously mentioned, this court is called on to interpret Amendment 19, and in relevant simple terms, that provision *prohibits* the General Assembly from *increasing personal taxes except* after the *voters approve the increase, or in case of emergency, the General Assembly approves the increase by a three-fourths vote.*

Here, the voters have not approved an increase in personal taxes, so the issue is, did an *emergency* exist that would authorize the General Assembly under Amendment 19 to enact a measure by a three-fourths vote to increase such taxes? In determining what is meant by the limiting language of Amendment 19, this court should look to the history and state of things existing when the constitution was framed and adopted. *Glover v. Hot Springs Kennel Club*, 230 Ark. 544, 323 S.W.2d 902 (1959); *Lybrand v. Wafford*, 174 Ark. 298, 296 S.W.2d 729 (1927). With this principle in mind, this court must look to the situation confronting the Arkansas people when they adopted Constitutional Amendment 19 in 1934, and when it does so, the conclusion is obvious — Arkansas and all states were fighting a depression. Unquestionably, Arkansas voters passed Amendment 19 to prohibit the increase in taxes except (1) when the people approved them, or (2) in *emergencies*, when the General Assembly enacted an increase by a three-fourths vote.

The majority opinion mistakenly relies on cases from other jurisdictions that lend no light on Amendment 19's history, but instead espouse general principles largely concerning statutory construction. Here, the reader must keep in mind that this court is asked to expound on the Arkansas Constitution.

The majority opinion also looks to Arkansas's Initiative and Referendum Amendment 7 to define the meaning of emergency and in support cites to a plurality opinion, *Priest v. Polk*, 322 Ark. 673, 912 S.W.2d 902 (1995). However, this court's decision in *Burroughs v. Ingram*, 319 Ark. 530, 893 S.W.2d 319 (1995), appears to be the prevailing law and, in *Burroughs*, this court held the word "emergency," in its most accepted usage, means some sudden or unexpected happening that creates a need for immediate action.

Act 1052 reveals no "sudden or unexpected happening," which required its passage by the General Assembly. To the contrary, § 9 of Act 1052 merely recites that the General Assembly studied the State's higher quality education programs and its studies showed that, in the year 2000, workers will need more education and the State is in desperate need of training, retraining, and

upgrading the work force. The Act further reads that the Act "will provide the funding necessary to provide every citizen with an opportunity to participate in vocational-technical training or college transfer programs, and that it is necessary for this Act to become effective immediately to provide the funding needed for these programs as soon as possible."

In sum, while I am the first to concede that Act 1052's objective is a lofty one, the fact remains that it cannot fairly or reasonably be said that the establishment of a program to train all citizens to function in the workplace by 2000 is a concept or goal that resulted from a "sudden" or "unexpected" event.

In conclusion, I must respond to the majority opinion's final suggestion that this court's holding that Act 1052 is an emergency measure does not deprive the people of their rights to refer any measure to a popular vote. First, I note the obvious that it is much too late now for citizens to refer Act 1052's tax increase to the vote of the people. *See* Amendment 7 to the Arkansas Constitution. Second, and more important, the majority's suggestion cryptically underscores that, under today's decision, the Arkansas people now have the burden to remain watchful for tax-increase measures like Act 1052 in the future, and be organized, well-funded and otherwise prepared to initiate referendums on such measures.

It is difficult, if not impossible, for me to believe that, when the voters of Arkansas passed Amendment 19, they intended an emergency could be so easily declared so as to authorize the General Assembly to approve a tax increase without a vote of the people. Nor did they intend to establish a situation or procedure whereby Arkansas voters would be forced to refer tax-increase measures in order to ensure their right to vote on such taxes. The majority opinion's interpretation of Amendment 19 and its term "emergencies" is much too broad, and in my view, is error.

For the above reasons, I would reverse and dismiss.

NEWBERN, J., joins this dissent.