VANCE, ET AL., V. AUSTELL, ET AL.

FUTRELL, ET AL., V. AUSTELL, ET AL.

1. COUNTY SEATS: *Change of: What votes necessary for: Constitution: Statute.*

The constitutional provision that "No county seat shall be established or changed without the consent of a majority of the qualified voters of the county," means a majority of the qualified voters voting at the election, and fixes this as the *minimum* vote necessary to effect a removal, but does not prohibit the legislature from prescribing a larger vote; and *Section 1165, Mansfield's Digest,* which fixes the number assessed for poll tax on the last assessment as the criterion of the number of voters in the county, is not in conflict with the constitution.

2. SAME: *Same.*

Under the constitution and the statute, *Sec. 1165, Mansf. Dig.,* a removal of a county seat cannot be made unless a majority of the votes cast be in favor of changing to a particular point, and exceeds one-half of the polls returned by the assessor.

3.  SAME:  *The qualified voters :   The poll assessment conclusive.*
The assessment of polls, as returned by the assessor, is conclusive of the number
of qualified voters in the county at an election for removal of a county seat ;
and no extraneous evidence is admissible to enlarge or diminish the number.

APPEAL from *Cross* Circuit Court.

Hon. M. T. SANDERS, Judge, on exchange of circuits.

*Clark & Williams* for Appellant.

Sec. *1165, Mansf. Dig.*, is unconstitutional.   *Sec. 3, Art.
XIII, Const. 1874*, provides that no county seat shall be estab-
lished or changed without the consent of a majority of the
qualified voters of the county, etc., means a majority of
qualified voters actually participating in the election.   The
provision is self-executing.  *Mc Crary on Elections, Sec. 183;
95 U. S., 360; 54 Mo., 391; 111 U. S., 556; 20 Ill., 159; 47 Ill.,
246; 16 Wall., 644.*

The negative words in the provision mean also the converse,
that a majority may remove.   An affirmative provision involves
a negative.   *1 Wall., 252; 1 Cranch., 137; 5 Pet., 284; 12 Id.,
637; 6 Wheat., 264; 36 Ark., 412; Potter's Dwarris on Stat., ed.
of 1871, pp. 228, 230; 5 Tex., 428; 1 Paine, 406; Dane's Abr.,
Vol. 6, pp. 561, 593.*

The legislature could not make the list returned by the
assessor conclusive evidence of the number of qualified voters.
*32 Ark., 121.*   Many persons are included in this list who are
not voters at all, viz: lunatics, idiots, widows, non-residents, etc.

After the first Monday in June, the assessor could neither
add to nor strike from his book a single name.  *Mansf. Dig.,
Sec. 5672.*

25——45

Vance, et al., v. Austell, et al.    Futrell, et al., v. Austell, et al.

*Jno. M. Rose* contra.

Cites *80 Ky., 559; 1 Lea, 195; 5 Heisk., 310; 3 Baxter, 277; 54 Mo., 393–5–6–7–8; 11 Lea, 26–9; 31 Kans., 46, 464; 26 Kans., 419.*

SMITH, J.   These appeals both involve the removal of the county seat of Cross, under two successive elections, held for that purpose.   In the year 1883 the county court had ordered a special election for the determination of this question.   The assessor's books for that year showed 1200 persons assessed for a poll tax.   The total vote polled was 691, of which 455 were for change to Vanndale, and 236 were against change. No further orders were then made in relation to this election, the county court and all interested apparently considering that the proposition to remove the county seat from Wittsburg had been defeated.   And another petition having been presented for the purpose, the question was again submitted to a popular vote, to be taken at the general election in 1884.   The county court declared that this election had also failed, no place having received the requisite majority.   An appeal was taken to the circuit court, where the cause was tried *de novo*.

The bill of exceptions shows that the contestants introduced the assessment books for 1884, showing 1352 persons in Cross county liable to pay a poll tax; the official affidavit or return to said assessor's book bearing date September 30, 1884.

W. P. Brown, the assessor of Cross county for the year 1884, testified as follows:

"I returned my assessor's book on the first Monday in June, 1884, to the board of equalization.   I told them that it was not complete, and that I was not willing to make the affidavit required by law, as the overflow and gnats had prevented me from making such a canvass of the county as would have been satisfactory to me.   There were 1205 persons liable to pay poll

tax upon my book when it was before the equalization board. I took it home to add it up and to add other names as I might find them. I added names at different times, and at the time of the election the book had on it 1220 or 1222 persons liable to a poll tax. I returned the book to the clerk's office about the 1st day of July, 1884, and left it there. After the election I added about 130 names to the book.

"But for the election I do not suppose I should have added the 130 names. I found names on the poll that I did not have on my assessor's book, and so I made an additional assessment. Before the election I was of the opinion that I had about all the persons liable to pay a poll tax, and might have made my affidavit any day if my attention had been called to it. I visited most of the persons I put on after the election. Some, probably a dozen, I did not see, but had good information of their being in the county.

"I do not know how many young men I put on after the election, who had voted, and who became of age after the first Monday in June, the time fixed by law for me to return my book, but there were several. I think about five or six. All the names that I added on the assessment book, after the first Monday in June until I delivered it in the county clerk's office in July, and all the names added subsequently, including the 130 added after the election, were persons liable to pay a poll tax on the first Monday in June, 1884, when the assessment was returnable, except the young men mentioned."

It was agreed that the returns of the county canvassing board show that there were cast in the election, for Vanndale 634 votes, and for Wynne 565 votes; and that the vote for change was 1100; and that the returns of the canvassing board, on file in the office of the county clerk of Cross county, made in legal form as the result of said election, show said votes so returned. This was all the evidence.

The circuit court found the facts to be : That the number of persons in said county assessed and liable to assessment in 1884, for a *per capita* tax, was 1345. That on the question of the removal of the county seat, legally submitted and voted on at the general election, held in said county, on the 1st day of September, 1884, a majority of the qualified voters of said county, according to the assessment and enumeration of *per capita* tax-payers, voted for change. That two places, to wit: Vanndale and Wynne, had been designated as the location to which said removal was proposed to be made, and were voted for. That 634 votes were cast for Vanndale and 565 votes were cast for Wynne. That neither the said number of votes cast for Vanndale, nor the said number cast for Wynne, was a lawful majority of the qualified voters of said county, and neither one of said places to which the change was proposed to be made, received the required majority at said election. And the court declared the law to be :

Approved.

1. *Section 1165 of Mansfield's Digest*, which provides that, for the purpose of ascertaining the number of qualified voters of any county, and the lawful majority necessary to authorize the change or removal of any county seat, the county court shall be governed by the number of persons liable to pay a poll tax as returned upon the assessor's books, is not in conflict with the Constitution of the state, and all doubts as to the power of the legislature to establish the rule prescribed in said section are to be resolved in favor of the statute.

Overruled.

2. The assessor's book or return is not conclusive of the number of persons liable to pay a poll tax, but is open to correction by extraneous evidence showing that the assessor failed to list all persons liable to pay a poll tax, or that he erroneously listed persons not liable to pay a poll tax; and if it appears that the names of persons subject to said tax were by accident, mistake, omission or neglect of the assessor, not

returned, they should be counted in a contest for removal, although they do not appear on the assessor's books when delivered to the county clerk.

3. It was improper in the assessor to list and enter names on his books after the election, but if such persons were legally liable and should have been duly returned for a poll tax, the fact that they were subsequently added would not affect the principle applied in construing the statute.

<div style="float:right">Overruled.</div>

4. The theory of the statute is, that the assessor duly performed his official duty and listed every person in his county liable to pay a poll tax, but this presumption may be rebutted, and if the proof shows that he failed to make a full and complete list of poll tax-payers, the names of all proved to be liable for such tax and omitted or not returned, should be included in computing and determining the lawful majority necessary to authorize removal.

<div style="float:right">Overruled.</div>

It was, therefore, ordered that the proposition for a removal of said county seat from its present location be considered as rejected.

After the cause growing out of the last election had been thus decided, and an appeal to this court had been taken, the county court recurred to the first election of 1883, and appointed commissioners to erect, purchase or otherwise provide suitable buildings at the town of Vanndale for the reception of the records and archives of the county, and for the use of its officers and courts. Austell and others intervened and prayed that the order of removal be vacated. And when their petition was denied they appealed to the circuit court, where they succeeded in obtaining a decision that the election of 1883 had likewise failed, the number of those voting for removal to Vanndale not being a majority of the poll tax-payers in the county. Both causes have been removed here by appeal and have been argued and submitted together.

Vance, et al., v. Austell, et al.   Futrell, et al., v. Austell, et al.

1 COUNTY
SEATS: Change
of: What vote
necessary.

Constitution.

Statute.

*Section 3 of Article XIII., Coustitution of 1874,* provides that " No county seat shall be established or changed without the consent of a majority of the qualified voters of the county to be affected by such change, nor until the place at which it is proposed to establish or change such county seat, shall be fully designated." Does this language mean a majority of those persons resident in the county who possess the qualifications of electors, or merely a majority of those who actually participate in the election? Cases are to be found in the reports where the first mentioned construction has been placed upon similar language in constitutional provisions. Such are *Cooke v. Gooch, 5 Heisk., Tenn., 294,* afterwards followed in *Bouldin v. Lockheart, 1 Lea, 195;. Hawkins v. Carroll County, 50 Miss., 735.* But the great weight of authority is that, " Where a statute requires a question to be decided, or an officer to be chosen by the votes of a majority of the voters of a county, this does not require that a majority of all persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by the majority of the votes cast; provided always there is a fair election and an equal opportunity for all to participate. In such a case the only proper test of the number of persons entitled to vote is the result of the election as determined by the ballot-box, and the courts will not go outside of that to inquire whether there were other persons entitled to vote who did not do so. The voters of the county referred to by all such statutes are necessarily the voters who voted at the election, since the result in each case must be determined by a count of the ballots cast, and not by an inquiry as to the number not cast." · *Mc-- Crary on Elections, Sec. 183 and cases cited; Railway Company v. Davidson County, 1 Sneed, 692; State v. Mayer, 37 Mo., 272; St. Joseph Township v. Rogers, 16 Wall., 644.* This doctrine is as old as *Rex v. Foxcraft, 2 Burrows, 1017,* (decided in 1760,) when Lord Mansfield observed, " Whenever electors. are present and don't vote at all, they virtually acquiesce in the-

election made by those who do." And in the same case Wilmot, J., referred to an earlier case, where, out of eleven voters, five voted and six refused; and it was held that the six virtually consented.

In *County of Cass v. Johnston, 95 U. S. 360,* the Constitution of Missouri had ordained that no county should take stock in a private corporation. "unless two-thirds of the qualified voters of such county, at a regular or special election to be held therein, shall assent thereto." The legislature passed an act, authorizing a subscription to the capital stock of railway companies, whenever it appears, by the returns of an election duly called for that purpose, "that not less than two-thirds of the qualified voters voting at such election are in favor of such subscription." This was decided not to be repugnant to the Constitution. And it was said: "All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. Any other rule would be productive of the greatest inconvenience, and ought not to be adopted, unless the legislative will to that effect is clearly expressed."

In *Carroll County v. Smith, 111 U. S., 556,* the same provision in the Constitution of Mississippi was held not to require an assenting vote of two-thirds of the whole number enrolled as qualified to vote, but only two-thirds of those who actually voted at the election. *Hawkins v. Carroll County, 50 Miss., 735,* which had placed a contrary interpretation upon this provision, was disregarded, notwithstanding it was a decision of the highest court in Mississippi, construing the Constitution of the state. And it was said: "The words, qualified voters, as used in the Constitution, must be taken to mean, not those qualified and entitled to vote, but those qualified and actually voting. In that connection a voter is one who votes, not one who, although qualified to vote, does not vote."

The legislature in 1875 passed an act (*Mansf. Dig., Secs. 1154, 1165,*) for the locating and changing of county seats. This act manifestly proceeds upon the assumption that the phrase, "qualified voters of the county," used in the Constitution, meant persons in the county who were entitled to vote. And it makes the assessor's return of persons liable to pay a poll tax, the criterion for ascertaining the number of qualified voters, and the lawful majority necessary to· authorize a removal. It betrays a misconception of the legal meaning of the language employed by the framers of the Constitution. For it erects an arbitrary standard for determining the result of the election, and obliterates the distinction between poll tax payers and qualified voters. Every male inhabitant over the age of twenty-one years, including aliens, convicted felons, idiots, insane persons, persons who have died or removed from the county since the assessment, and persons who have not resided in the state, county or voting precinct long enough to entitle them to the right of suffrage, is liable to a *per capita* tax. *Mansf. Dig., Sec. 5598; Constitution of 1874, Art. III, Secs. 1, 2 and 5.*

Again, the act is open to grave objections if the constitutional provision vests an absolute right of removal in the majority voting therefor. Such an implication would probably arise if the phraseology occurred in a statute. It would be held that the negative form of expression, "No county seat shall be established or changed without the consent of a majority," etc., carried with it the affirmative proposition that a change should be made, if a majority voted for it. But the constitution of a· state is not a grant of enumerated powers. Its chief object is to impose limitations upon the several departments of government. We look to it, not so much to see whether a contested enactment is authorized, but whether it is prohibited. For, if not prohibited either by the letter or the spirit of the fundamental instrument, it is authorized. If our

Constitution had contained no restraints upon the establishment and removal of county seats, the authority of the legislature would have remained supreme and plenary. It could have changed them on any vote, or upon no vote at all. But the Constitution has forbidden any change without a submission of the question to the people immediately concerned. And it has prescribed the minimum vote necessary to effect a removal, viz: a majority of those participating in the election. To this extent the legislature is bound; but beyond this its power is left untrammeled. And it may provide any additional, or higher condition for removal, without violating the Constitution.

In *Alexander v. People, 2 Pacific Reporter, 894,* the constitutional provision was, "no county seat shall be removed unless a majority of the qualified electors vote therefor." The supreme court of Colorado held valid an act of the legislature, making a two-thirds vote necessary for a removal.

The result is that, under our Constitution and laws, before a removal can be had, there must be a majority vote in favor of the proposition to remove the county seat to a particular point, and the vote cast in favor of the proposition must exceed one-half of the polls returned by the assessor. The last requirement is not an unreasonable regulation.

2. SAME.

Applying this double test, it is obvious that the election of 1883 failed of its object. But the election held in 1884 satisfied both the constitutional and the legislative test. Eleven hundred and ninety-nine votes were polled; and of these eleven hundred were for change. Vanndale received six hundred and thirty-four, a clear majority of the total vote cast, and more than one-half of the polls returned by the assessor. The assessment list had been delivered in the clerk's office, on the first Monday of June, as required by *Sec. 5672, Mansf. Dig.* And being so returned, it was a finality for all purposes connected with a county seat election. *Ib., 1156.* It matters not that there were other

3. SAME:— Qualified voters: Poll assessment conclusive.

persons in the county who were liable to assessment for a *per capita* tax and whose names were afterwards added by the assessor; nor that some of the persons included in the list were not, in fact, legal voters.   The statute has adopted the list for convenience as a criterion to determine the result, under the notion that it would show approximately the number of voters living in the county.   It would destroy the certainty and the value of such a criterion to allow the courts, in the event of a contest, to inquire into the completeness of the list, or to enter upon an investigation into the qualifications of electors who did not offer to vote.

The list showed 1205 persons liable to a poll tax; and the names that were subsequently interpolated should have been disregarded.

The first declaration of law is approved.   The remaining three are erroneous in holding that the assessor's books are not conclusive for the purposes of the election, but open to contradiction and correction by extraneous proof.

In the case first above entitled, the judgment of the circuit court is affirmed.   In the other, the judgment is reversed, and cause remanded with directions for a new trial and for further proceedings in conformity to this opinion.