GLOVER v. HOT SPRINGS KENNEL CLUB.

5-1800                    323 S. W. 2d 902

Opinion delivered May 11, 1959.

*Wood, Chesnutt & Smith,* for appellant.

*Wright, H a r r i s o n, Lindsey & Upton; House, Holmes, Butler & Jewell; Edward B. Dillon, Jr.,* and *Richard W. Hobbs,* for appellee.

ED F. McFADDIN, Associate Justice. This appeal necessitates a study of Act No. 191 of the 1957 Legisla-

ture.[1]  The question presented is whether it is necessary for the proposition submitted to the voters under § 9 of the Act No. 191 to receive merely a majority of all the votes *cast at the election,* or must the proposition receive a majority of *all of the poll tax holders of the county involved.*

The appellee, Hot Springs Kennel Club, Inc., filed action in the Garland Circuit Court against the appellants, being the Garland County Election Commissioners; and prayed *inter alia,* that the Court direct the defendants to certify to the Arkansas State Racing Commission that the proposition submitted to the voters in Garland County under the Act No. 191 had received a majority of the votes, and had carried.  The defendants denied that the proposition had carried.  The case was submitted to the Circuit Court on stipulated facts, substantially as follows:

(1)  The plaintiff, Hot Springs Kennel Club, Inc., is a corporation; and the defendants, R. Julian Glover, Harvey Craig, and Roy Mitchell, are the duly appointed and acting Election Commissioners of Garland County, Arkansas.

(2)  In accordance with Act No. 191 of 1957, the plaintiff made application to the Arkansas State Racing Commission for a temporary franchise to conduct greyhound dog racing in Garland County; said temporary permit was issued; and the defendant Election Commissioners, being notified of the grant of the temporary franchise, called a Special Election in Garland County to submit to the voters therein the issue of approval or disapproval of greyhound racing.

(3)  At the said Special Election, held in Garland County on May 6, 1958, there were 4,662 votes cast in favor of greyhound dog racing and 3,882 cast against greyhound dog racing; and the applicable poll tax list

---

[1] This Act is captioned: "An Act to Legalize Greyhound Racing and Pari-Mutuel Wagering Thereon in All Political Sub-Divisions of the State of Arkansas; to Regulate and Control Greyhound Racing and Pari-Mutuel Wagering Thereon in the State of Arkansas; to Repeal Act 339 of the Acts of 1935, approved April 4, 1935; and for Other Purposes."

of Garland County at the time of the election showed that there were 17,245 poll tax holders named on the list.

On the foregoing stipulated facts, the Circuit Court ruled that the greyhound racing proposition had carried, and directed the defendants to so certify to the State Racing Commission. The Circuit Judge delivered a written opinion which is in the transcript and has proved helpful to this Court. The following are the points relied on by the appellants on this appeal:

"It was the intention of the Legislature, in enacting Sections 6, 9 and 10 of Act No. 191 of 1957 (Sections 84-2821 to 84-2824 and 84-2825, Arkansas Statutes, 1947), to require the affirmative vote of a majority of all of the qualified electors of the county in order to approve greyhound racing.[2] The official Poll Tax List of Garland County for the Year 1957 is *prima facie* evidence of the number of qualified electors of the county. The proposition for greyhound racing did not receive the af-

---

[2] For convenient reference, we copy the pertinent portions of the sections of Act No. 191, as above referred to, with emphasis supplied by us:

"Sec. 6. (A)    Except as otherwise hereinafter provided, the Commission shall not be authorized to grant, nor shall it grant, a franchise to any corporation to conduct Greyhound Racing in any county in this State unless and until the proposition of Greyhound Racing shall have been approved *by a majority of the qualified electors of such county* at a special election called for that purpose . . .

"Sec. 9 (B)    The special election shall be conducted under the General Election Laws of this State, and at any such election there shall be printed upon the ballots the words 'For Greyhound Racing' and 'Against Greyhound Racing'; and any such proposition shall be carried when *approved by a majority of the qualified electors of the county* . . .

"Sec. 10 (A)    After the elapse of not less than four (4) years next following the date of any election conducted pursuant to Section 9 hereof, the County Board of Election Commissioners shall, upon petitions filed with it containing the signatures of qualified electors of the county of not less than fifteen per cent (15%) *of the total number voting in the election for County Clerk of such county at the next preceding General Election,* together with a sum of money estimated by the Board as sufficient to pay all expenses of the election, call a special election on the proposition of continuing Greyhound Racing in the county . . .

"Sec. 10 (C)    *If a majority of the qualified electors of the county voting on the question* shall disapprove the continuance of Greyhound Racing, the franchise held by the corporation shall, *ipso facto*, be null and void as of the final date on which a contest of the results of the election may be commenced, or, in the event of contest, upon the date of final determination of the issue."

firmative vote of a majority of those listed in the Official Poll Tax List, and the court below, therefore, erred in declaring that the proposition carried."

I. *Intention Of The Legislature.* The appellants insist that it was the ". . . intention of the Legislature . . ." to require the affirmative vote of a majority of all the poll tax holders of the County in order to approve greyhound racing. It is well established that in construing statutes it is the duty of the courts to ascertain and declare the "intention of the Legislature," *as expressed in the statute.* In *State ex rel. Atty. Gen.* v. *Trulock,* 109 Ark. 556, 160 S. W. 516, Chief Justice McCulloch said: "The cardinal rule of interpretation is the ascertainment of the meaning of the lawmakers, as expressed in the language which they used. Not what the lawmakers themselves meant, but what the language they used means; and all rules of interpretation must yield to this as the paramount one." In *Berry* v. *Sale,* 184 Ark. 655, 43 S. W. 2d 225, Chief Justice Hart said: "This Court has uniformly held that, in the construction and interpretation of statutes, the intention of the Legislature is to be ascertained and given effect from the language of the act if that can be done."

In *Bullion* v. *Aetna Ins. Co.,* 151 Ark. 519, 237 S. W. 716, Judge Frank G. Smith stated the rule in this language: "In passing upon this question we conceive it to be our duty only to ascertain the legislative intent, and this must be done by interpreting the words which the Legislature itself has employed in expressing that intent. It is an accepted canon of construction that 'where a word which has a known legal meaning is used in a statute, it must be assumed that the term is used in its legal sense, in the absence of an indication of a contrary intent . . .' " The Circuit Judge, in his opinion in this case, concisely stated the rule: ". . . where the Legislature has used a word, phrase, or group of words which have received a judicial construction and interpretation, it is presumed that the Legislature used the word, phrase, or group of words in the light of the judicial interpretation placed upon said word, phrase, or group of words."

So we see the words in Sections 6 and 9 of the Act No. 191 here under investigation are: ". . . a majority of the qualified electors of the county . . . ," and we proceed now to see if such words have been judicially determined and construed by this Court, in order that we may ascertain the legislative intention in the use of those words.

II. *Previous Decisions Construing "Majority Of The Qualified Electors."* As heretofore stated, the question is whether it was necessary for the greyhound racing proposition submitted to the voters of Garland County to receive *merely a majority of those voting* on the proposition at the election, or was it necessary for the proposition to receive the vote of a *majority of all of the* 17,245 *poll tax holders* of Garland County. It will be observed that in Section 6 (A) the words are, ". . . a majority of the qualified electors of such county at a special election called for that purpose . . . "; and in Section 9 (B) the words are, ". . . and any such proposition shall be carried when approved by a majority of the qualified electors of the county . . . "[3] Do the said words in Section 6 and Section 9—"a majority of the qualified voters of the county"—standing alone and without further qualifying or modifying words, as they do, have a fixed and definite meaning in legal parlance? The answer is, yes: the words do have a fixed and definite meaning by the decisions of this Court; and such fact is the decisive answer in this case. We have an impressive line of decisions of this Court on the point, some of them being: *Vance* v. *Austell* (1885), 45 Ark. 400; *Watts* v. *Bryan* (1922), 153 Ark. 313, 240 S. W. 405; *Graves* v. *McConnell* (1924), 162 Ark. 167, 257 S. W. 1041; and *Browning* v. *Waldrip* (1925), 169 Ark. 261, 273 S. W. 1032.

In *Vance* v. *Austell* (*supra*), the Supreme Court of Arkansas considered Art. 13, Sec. 3 of our Constitution, which says that a county seat shall not be established or changed without ". . . a majority of the qualified voters of the county . . . "; and this Court said of

_____

[3] The provisions in Sections 10 (A) and 10 (B) relate to subsequent elections, and will be discussed near the end of this opinion.

the words, "majority of the qualified voters of the county":

"Does this language mean a majority of those persons resident in the county who possess the qualifications of electors, or merely a majority of those who actually participate in the election? Cases are to be found in the reports where the first mentioned construction has been placed upon similar language in constitutional provisions. Such are *Cooke* v. *Gooch*, 5 Heisk., Tenn., 294, afterwards followed in *Bouldin* v. *Lockheart*, 1 Lea, 195; *Hawkins* v. *Carroll County*, 50 Miss. 735. But the great weight of authority is that, 'Where a statute requires a question to be decided, or an officer to be chosen by the votes of a majority of the voters of a county, this does not require that a majority of all persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by the majority of the votes cast; provided always there is a fair election and an equal opportunity for all to participate. In such a case the only proper test of the number of persons entitled to vote is the result of the election as determined by the ballot-box, and the courts will not go outside of that to inquire whether there were other persons entitled to vote who did not do so. The voters of the county referred to by all such statutes are necessarily the voters who voted at the election, since the result in each case must be determined by a count of the ballots cast, and not by an inquiry as to the number not cast.' McCrary on Elections, Sec. 183 and cases cited; *Railway Company* v. *Davidson County*, 1 Sneed, 692; *State* v. *Mayer*, 37 Mo., 272; *St. Joseph Township* v. *Rogers*, 16 Wall. 644. This doctrine is as old as *Rex* v. *Foxcraft*, 2 Burrows, 1017 (decided in 1760), when Lord Mansfield observed, 'Whenever electors are present and don't vote at all, they virtually acquiesce in the election made by those who do.' "[4]

---

[4] In the same cases of *Vance* v. *Austell*, the Court said that the Legislature could make a higher test than the "majority of the voters of the county", and that the higher test could be used, as, for instance, in § 17-209 Ark. Stats., wherein it is provided: "To ascertain the number of qualified electors of any county for the purposes of this Act and the lawful majority necessary to authorize the change or removal of any county seat as herein provided for, the county court shall be governed

In *Watts* v. *Bryan* (*supra*), this Court again held that the words, "majority of the qualified electors of such county," meant only a majority voting on the proposition submitted. The facts in the case emphasize the holding. Amendment No. 3 to the Arkansas Constitution says that the quorum court will have power to levy a 3-mill road tax, ". . . if a majority of the qualified electors of such county shall have voted public road tax at the general election for State and county officers preceding such levy at such election . . . " At the election in Searcy County, a majority of those voting on the proposition voted for the 3-mill road tax, but such was *not a majority of the persons who voted at the election*. In other words, many electors voting at the election entirely failed to vote either way on the road tax proposition. This Court, in a unanimous opinion by Chief Justice McCulloch, held that the said 3-mill road tax proposition had carried at the election in Searcy County because it had received a majority of the votes of those who voted on the proposition, even though it did not receive a majority of those who voted at the election:

"Our conclusion, therefore, is that Amendment No. 3 requires only a majority of those voting on the question in order to authorize the levy of a road tax, and that a majority of the highest number of votes cast at the election is not required."

In *Graves* v. *McConnell* (*supra*), this Court had before it the words, "majority of the qualified electors residing in said described district." There were 2,250 qualified electors residing in the district. At the election there were only 1,450 votes cast; and of these 760 voted for the proposition and 688 voted against the prop-

---

by the number of persons who have paid their poll tax, as shown by the names of persons who have paid their poll tax as filed with the county clerk by the collector (on the first Monday in July) preceding the holding of any election for the removal or change of any county seat under this Act . . . ." In short, the Court held in *Vance* v. *Austell* that the words, "majority of the voters of the county", standing alone, mean the majority of those voting at the election; and that if the Legislature wanted to prescribe a higher test, as the majority as determined by the poll tax books, then the Legislature could do so; but, in the absence of such further requirements, the words "majority of the voters of the county" mean the majority of those voting on the proposition at the election duly held.

osition. This Court, in a unanimous opinion by Justice CARROLL D. WOOD, held that the proposition had been duly adopted because it received a majority of the votes cast on the proposition:

"Section 5 of the act, among other things, provides: 'No provision of this Act shall become effective until it has first been approved by a majority of the qualified electors residing in said described district.' In *Watts* v. *Bryan,* 153 Ark. 313, an amendment to the Constitution contained the following provision: 'If a majority of the qualified electors of such county shall have voted public road tax * * * .' In that case we held that this language requires a majority only of those voting on the question, and not a majority of the highest number of votes cast at the election, nor a majority of all persons in the county entitled to vote. See also *Vance* v. *Austell,* 45 Ark. 400, where we gave similar language a like construction. The canvass of the returns by the commissioners of the votes cast upon the subject showed a majority for making the law effective. It follows therefore that, under the above decisions, the commissioners should have proclaimed the law in effect."

Another case to like effect is *Browning* v. *Waldrip* (*supra*). There, the act (No. 579 of 1923) required that the proposition be approved by "a majority of the land-owners of the said district"; and this Court, in a unanimous opinion by Justice CARROLL D. WOOD, said:

"A majority of the landowners in the district, who voted at the election to put in operation the law creating the district, voted in favor of the district. Under the provisions of the act it was to take effect when a majority of the landowners in the district had voted in favor of the law. This provision was complied with when a majority of the landowners in the district voting at the election on the question favored putting the law into effect. *Graves* v. *McConnell,* 162 Ark. 167; *Watts* v. *Bryan,* 153 Ark. 313."

There is no need to emphasize the matter further.[5] When the Legislature of Arkansas used the words in Sections 6 and 9 of this Act, as heretofore quoted— ". . . a majority of the qualified electors of such county at a special election called for that purpose," and ". . . and any such proposition shall be carried when approved by a majority of the qualified electors of the county"—it is clear beyond peradventure of a doubt that the words were used in their recognized legal significance and meant a majority of people of the county who voted on the proposition, and not a majority of all the people of the county who had poll tax receipts.

We recognize that the Legislature may make the requirements different from a majority of those voting on the proposition at the election: the Legislature has done so in a number of instances. In court house removal elections under § 17-209 Ark. Stats., the Legislature has required that the proponents of removal receive a majority of all of the qualified electors in the county as determined by the poll tax books. See *Vance* v. *Austell*, 45 Ark. 400, and *Velvin* v. *Kent*, 198 Ark. 267, 128 S. W. 2d 686. As to the petition to call a local option election under Initiated Act No. 1 of 1942 (§ 48-801 Ark. Stats.), the requirement is that the petition be signed by 15 per cent "of the qualified electors as shown on the poll tax records." (See *Tollett* v. *Knod*, 210 Ark. 781, 197 S. W. 2d 744.) In the Act No. 191 here involved, the Legislature showed that it knew about these matters, because in Section 10 of the Act 191 the Legislature, in providing for a referendum petition four years after the first election, said that the referendum petition should contain the signatures of 15 per cent of the qualified electors

---

[5] Formerly this Court held that the language, "if a majority of the electors voting at such election adopt such amendments the same shall become a part of this Constitution", meant a majority of all the electors *voting at the election* and not a mere majority of those voting on the *particular proposition*. See *Rice* v. *Palmer*, 78 Ark. 432, 96 S. W. 396; and *Hildreth* v. *Taylor*, 117 Ark. 465, 175 S. W. 40. But a Special Supreme Court of Arkansas (of which former Governor T. C. McRae was Special Chief Justice), in the case of *Brickhouse* v. *Hill*, 167 Ark. 513, 268 S. W. 865, overruled *Rice* v. *Palmer* and *Hildreth* v. *Taylor*, and held that a constitutional amendment was adopted when it received only a *majority of those who voted on the proposition:* it was not required to receive a majority of all the people who voted at the election.

who voted "in the election for county clerk of said county at the next preceding general election." In other words, the Legislature recognized that it could make a test; and in Section 10 (C) of the Act No. 191, after thus making the test for the referendum petition, the Act said that the dog racing franchise would be null and void if "a majority of the qualified electors of the county voting on the question" should disapprove the continuance of greyhound racing.

We conclude: that Act No. 191 stated in Sections 6 and 9, that the proposition to be voted on was to be approved by "a majority of the qualified electors of such county"; that the Legislature used those words after they had been judicially construed by this Court in the cases that we have named; and those words had a fixed legal meaning, to-wit: a majority of those who voted on **the proposition.** Therefore, the judgment of the Circuit Court was correct.

**Affirmed.**

WARD, J., not participating.

HOLT & GEORGE ROSE SMITH, JJ., dissent.

J. SEABORN HOLT, J., dissenting. I do not agree with the majority view. This action involves the interpretation and construction of Act 191 of the 1957 Legislature. Only a question of law is presented. The facts were not in dispute. The appellants are the Election Commissioners of Garland County Arkansas. Appellee, the Hot Springs Kennel Club, Inc., has its principal place of business in the City of Hot Springs, Arkansas and proceeding under the provisions of Act 191, (Sections 84-2816—84-2842, inclusive, Ark. Stats. (1947) sought a temporary franchise to conduct greyhound racing in Garland County, Arkansas, and the Arkansas Racing Commission issued the temporary franchise on March 29, 1958. Upon being notified of this action by the racing commission granting the temporary franchise, the Garland County Election Commissioners called a special election to submit to the electors of Garland County Arkansas the question of approval or disapproval of greyhound racing in

accordance with the terms of the Act. Thereafter, on May 6, 1958, a special election was held in Garland County resulting in 4,662 votes in favor of greyhound racing and 3,882 votes against. Before certifying the result of the election, the commissioners requested an opinion from the Attorney General of the State of Arkansas, giving his interpretation and construction of the provisions of Act 191 for the guidance of the commission. On May 5, 1958, the Attorney General rendered his opinion, holding that under Act 191, in order for the proposition of greyhound racing to be approved, it must receive the affirmative vote of the majority of all of the qualified electors of Garland County and not merely a majority of those voting in the election. At this stage, the Hot Springs Kennel Club, Inc., (appellee) brought the present suit asking that the election commissioners be temporarily restrained from certifying that the proposition did not carry, that the Circuit Court construe the meaning of Act 191 and after so doing, direct the election commissioners to certify to the racing commission that the proposition had carried. On September 20, 1958, the Circuit Court, upon a hearing, held that while it was evidently the intention of the legislature to require a majority of all the qualified electors of the county as a whole to vote in favor of greyhound racing before a franchise could be granted, however, that Act 191 included no criterion for determining the number of qualified electors in the county and since the Act contained this omission, therefore a simple majority of those voting for greyhound racing in the election was sufficient. From that judgment is this appeal.

For reversal, appellants say, "It was the intention of the Legislature, in enacting Sections 6, 9 and 10 of Act No. 191 of 1957 (Sections 84-2821, 84-2824, 84-2825, Arkansas Statutes, 1947), to require the affirmative vote of a majority of all of the qualified electors of the county in order to approve greyhound racing. The official Poll Tax List of Garland County for the year 1957 is *prima facie* evidence of the number of qualified electors of the county. The proposition for greyhound racing did not receive the affirmative vote of a majority of those listed in the Offi-

cial Poll Tax List, and the court below, therefore, erred in declaring that the proposition carried.'.'

Among other things, the stipulated facts contained this statement: "* * * the records of the Collector of Garland County Arkansas reflect that 17,245 1957 poll taxes were purchased in Garland County and that the names of 17,245 poll tax holders appear on the official 1957 poll tax list for Garland County."

Those provisions of Act 191, material here, are contained in sections 6, 9 and 10 of that Act, (Sections 84-2821, 84-2824 and 84-2825, Pocket Supp.) Section 84-2821 (A) provides: "Except as otherwise hereinafter provided, the Commission shall not be authorized to grant, nor shall it grant, a franchise to any corporation to conduct Greyhound Racing in any county in this state unless and until the proposition of Greyhound Racing shall have been approved by a majority of the qualified electors of such county at a special election called for that purpose." Section 84-2824 (B) provides: "* * * The special election shall be conducted under the General Election Laws of this State, and at any such election there shall be printed upon the ballots the words 'For Greyhound Racing'; and 'Against Greyhound Racing'; and any such proposition shall be carried when approved by a majority of the qualified electors of the county." Section 84-2825 (A) "provides that after the lapse of not less than four years, the County Board of Election Commissioners shall, upon petitions filed, call a special election on the proposition of continuing Greyhound Racing in the county," and Section 84-2825 (C) "If a majority of the qualified electors of the county voting on the question shall disapprove the continuance of Greyhound Racing, the franchise held by the corporation shall, *ipso facto*, be null and void as of the final date on which a contest of the results of the election may be commenced, or, in the event of contest, upon the date of final determination of the issue."

The primary and decisive question presented is whether under the above terms of Act 191, the Legisla-

ture intended to require, in the original election, the approval of a majority of all the qualified electors of the county, or only a majority of the qualified electors of the county voting on the question. I am firmly convinced that under the plain terms of the Act, the Legislature intended the approval of a majority of all of the qualified electors within the county and that the trial court erred in holding otherwise.

Just what did the Legislature intend by this Act 191? In determining its purpose and intent, we have certain well established rules to guide us: *Holt* v. *Howard*, 206 Ark. 337, 175 S. W. 2d 384 — "* * * 'In seeking to ascertain the legislative intent, * * * the courts will take into consideration all the facts and circumstances existing at the time of, and leading up to, its enactment, such as the history of the times, the habits and activities of the people, the state of the existing law, and the evils to be remedied by the new act.' * * * It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute. A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.''

In *Lybrand* v. *Wafford*, 174 Ark. 298, 296 S. W. 729, we said: "It is settled by very high authority that, in placing a construction on a constitution, or any clause or part thereof, a court should look to the history of the times, and examine the state of things existing when the constitution was framed and adopted, in order to ascertain the old law, the mischief and the remedy. Constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of their adoption and the general spirit of the times and the prevailing sentiments among the people.''

I think it clear from the plain and unambiguous language used in the Act that it was the obvious purpose and intent of the Legislature to make it difficult to vote

greyhound racing into a county and to make it much less difficult to vote it out. It is significant that it is first specifically provided in the Act, as indicated above, that before a racing franchise may be granted, it must be ''approved by a majority of qualified electors of each county effected,'' and again in a following section this above provision is repeated in effect and emphasized in this language, ''Any such proposition (greyhound racing) shall be carried *when approved by a majority of the qualified electors of the county*''. In another subsequent section, the Act further specifically provides that, ''If a majority of the qualified electors of the county *voting on the question* shall disapprove the continuance of greyhound racing, the franchise held by the corporation shall, *ipso facto,* be null and void''. It would have been difficult, it seems to us, for the Legislature to have used plainer language in expressing its will. This wording of the statute points unerringly to the fact that the Legislature had in mind a distinction between the meaning of the words, ''A majority of the qualified electors'' and, ''A majority of the qualified electors voting on the question''.

The trial court, in its opinion, held that: ''*  *  * the records of the Collector of Garland County Arkansas reflect that 17,245 1957 poll taxes were purchased in Garland County and that the names of 17,245 poll tax holders appear on the official 1957 poll tax list for Garland County.  *  *  * In order to grant a franchise, a majority of the qualified electors of the county must vote in favor of having greyhound racing, but only a majority of those voting on the proposition is required to cancel a franchise. Therefore, *there can be no question but that it was the intention of the Legislature to require a majority of all the qualified electors of the county to vote in favor of Greyhound Racing before a franchise could be granted.*''

I fully agree with the trial court's finding that the Legislature *intended to require the affirmative vote of a majority of the qualified electors of any county* in favor of greyhound racing before a franchise could be issued, but I do not agree that the Legislature failed to effectuate its intent by not including in the Act any specific

criterion for determining the number of qualified electors in the county at the time of the election for the simple reason that none was needed to carry out the intent of the lawmakers. I also agree with appellee's argument that the law in this state is well settled that the words, "A majority of qualified electors", standing by themselves and without more, mean a majority of the qualified electors voting at the election. See *Vance* v. *Austell,* 45 Ark. 400. It appears to be equally well settled, however, in this state, that the Legislature may, by appropriate language, prescribe a requirement for the affirmative vote, or approval, of a greater majority than a mere majority of those voting at the election as it did prescribe by Act 191 here. It is significant that in the *Vance* v. *Austell* case, *supra,* it was held that while the constitutional provisons fixed a minimum vote necessary to remove the county seat, but, that the Legislature had full power to provide any additional or higher conditions for removal of a county seat, without violating the Constitution. The question at issue in the Vance Case was an Act of the Legislature which required that in any election for removal of a county seat the number of qualified voters of a county should be ascertained by the assessor's return should be required to vote in favor of removing the county seat. It is thus apparent that while the words, "A majority of the qualified voters", or "A majority of the qualified electors", mean, standing alone, only a majority of those voting at the election, however, the Legislature may prescribe that a greater majority may be required in an election on any proposition than those voting on such proposition. Had the Legislature thought the words, "A majority of the qualified electors of a county" to mean only "A majority of the qualified electors voting on the proposition", it would have been easy for it to have said so by using this latter expression only throughout the Act 191.

In the present case it is stipulated that 17,245 1957 poll taxes were purchased in Garland County, as reflected by the official poll tax list; that 4,662 votes were cast for greyhound racing and that 3,882 votes were cast against.

Obviously, a majority of the qualified electors in Garland County here would be more than 8,600 and that the affirmative vote for greyhound racing fell far short of this number. We take notice that the passage of Act 191 followed closely on the heels of public disapproval of the law then existing and relating to the awarding of a franchise for greyhound racing in West Memphis, Arkansas during 1956. It seems obvious that Act 191 was enacted to tighten control over greyhound racing. We must also bear in mind here that greyhound racing, like selling intoxicating liquors, is a privilege, impressed with the public interest, and is not a common right to all, and is, therefore, subject to legislative regulation. In *McClure* v. *Topf and Wright,* 112 Ark. 342, 166 S. W. 174, in holding valid a statute that liquor licenses should be issued only after filing of a petition signed by a majority of the adult white inhabitants living within a city, we said: ''The sale of such liquors in this way has therefore been at all times by the courts of every state considered as the proper subject of legislative regulation. It is a question of public expediency and public morality and not of Federal Law. The police power of the state is fully competent to regulate the business, to mitigate its evils, and to suppress it entirely. There is no inherent right of a citizen to thus sell intoxicating liquors by retail; it is not a privilege of a citizen of a state or of a citizen of the United States. The manner and extent of regulation rest in the governing authority. It is a matter of legislative will only.'' The principal of law announced in that case applies with equal force in the present case.

We have repeatedly held that the poll tax list prepared in accordance with Section 3-118 Ark. Stats. is *prima facie* evidence of the right to vote and evidence of the number of qualified electors in the county, or district, in which the election is held, and could be used as a proper criterion in determining such number of qualified voters. Here the official poll tax list of Garland County was, by stipulation, admitted in evidence and we hold that it was *prima facie* correct and the burden was on appellee to refute this presumption of verity by proof that it was incorrect.

The trial court was of the opinion that Act 191 designated no *criterion* by which to determine a majority of the qualified electors in the county and this opinion of the trial court is supported by appellees. In this, I think they are in error. In the case of *Ferguson* v. *Leach,* 210 Ark. 1032, 199 S. W. 2d 305, this court treated the official poll tax list as the *criterion* by which to determine 15% of the qualified electors as required by the statute.

Accordingly, I would reverse the judgment with directions to appellants, Garland County Election Commissioners, to certify to the Arkansas State Racing Commission that the proposition to permit greyhound racing did not carry.

GEORGE ROSE SMITH, J., dissenting. My very strong disagreement with the majority in this case can be quickly explained by means of an illustration. Let it be supposed that the legislature adopts a statute providing that upon a person's death intestate his real property shall descend as follows:

"(a) In the case of property that is an ancestral estate, to the decedent's children in equal shares, per stirpes.

"(b) In the case of property that is a new acquisition, to the decedent's children and adopted children in equal shares, per stirpes."

According to the reasoning of the majority in this case, under such a statute adopted children would be entitled to share in ancestral property. Why? Because we have held in three cases that the word children includes adopted children. *Kelly* v. *Kelly,* 176 Ark. 548, 3 S. W. 2d 305; *Deener* v. *Watkins,* 191 Ark. 776, 87 S. W. 2d 994; *Dyer* v. *Lane,* 202 Ark. 571, 151 S. W. 2d 678. We must therefore conclude that the legislature meant to include adopted children in subsection (a) of the supposed statute, for the word children must be given its settled legal meaning.

Now that conclusion would be wrong, as I wholeheartedly think the majority's conclusion in this case to

be. The rule that a word or phrase in a statute is to be interpreted in harmony with earlier judicial decisions is not an inflexible principle, to be woodenly applied in every instance. It is merely one of many rules of statutory construction, designed to help the courts discover the legislative intention when there is reason for uncertainty. As we said in *Bullion* v. *Aetna Ins. Co.,* 151 Ark. 519, 237 S. W. 716: "It is an accepted canon of construction that 'where a word which has a known legal meaning is used in a statute, it must be assumed that the term is used in its legal sense, *in the absence of an indication of a contrary intent.*'" (My italics.)

Going back to my illustration, we are practically certain that the legislature did not mean for the word children to include adopted children in subsection (a), because the different phraseology in subsection (b) makes it clear that a difference in meaning was also intended. The presumption that a difference in language carries with it a difference in meaning is based upon common sense and has been described as a presumption of great force. *Commonwealth* v. *Woodring,* 289 Pa. 437, 137 Atl. 635.

I am at a loss to discover any distinction between the illustration I have put and the case at bar. If the legislature had adopted only subsection (a) of the supposed statute, I should agree that the word children would embrace adopted children, in accordance with our decisions. If the legislature had adopted only § 9 of Act 191 I should agree that "a majority of the qualified electors of the county" would mean a majority of those voting on the question. But the explicit reference to adopted children in subsection (b) convinces me that the legislature did not use the word children in its accepted legal sense in subsection (a). In like manner, the explicit reference to "a majority of the qualified electors of the county voting on the question" in § 10 of Act 191 convinces me that the legislature did not use the shorter phrase in its accepted legal sense in § 9. I can see a sound reason for excluding adopted children from a share in

ancestral property, and I can see a sound reason for making it easier to vote dog racing out than to vote it in. I do not, however, see any reason for treating the dog racing proprietors more favorably than we would treat orphans in the illustration I rely on.