WINTHROP ROCKEFELLER ET AL *v.*
CHARLES D. MATTHEWS ET AL

5-5484                                    459 S. W. 2d 110

Opinions delivered November 2, 1970

*Wright, Lindsey & Jennings;* By: *Ronald A. May* and *Terry L. Matthews,* for appellants.

*Joe Purcell,* Attorney General; *Rodney Parham* and *Mike Wilson,* Asst. Attys. Gen., for appellees.

LYLE BROWN, Justice. The sole question determinative of this litigation is the constitutional validity of a provision in the 1969 Election Code requiring a run-off election following the general election for certain designated State officials. Ark. Stat. Ann. § 3-806 (b) (Supp. 1969), which comes from Acts 1969, No. 465, art. 8, § 6 (b), p. 1268. Section 3-806 (b), to validly stand, must square with that provision in our constitution covering the election of the same officials, art. 6, § 3. The appellants are Winthrop Rockefeller, Maurice Britt, and Odell Pollard; and the appellees are Charles D. Matthews, Joe Purcell, Kelly Bryant, Jimmy "Red" Jones, Mrs. Nancy Hall, and Sam Jones. Collectively the parties constitute the State Board of Election Commissioners. Appellants (movants below) alleged that appellees, in their capacities as election commissioners, intended to follow § 3-806 (b) and "certify names of two candidates receiving the highest number of votes where no candidate receives a majority of votes cast" at the general election on November 3. It was further asserted that such action would be in violation of Ark. Const. art 6, § 3. Appellees responded that there was no conflict between the constitutional and statutory provisions. Each side asked for a declaratory judgment sustaining its position. The trial court held that § 3-806 (b) was constitutionally proper, hence legally requiring a majority vote for the election of any of the constitutional officers named in art. 6, § 3 of the constitution. Article 6, § 3 of our constitution is as follows:

> Election of executive officers—The Governor [Lieutenant Governor], Secretary of State, Treasurer of State, Auditor of State, and Attorney General shall be elected by the qualified electors of the State at large at the time and places of voting for members of the General Assembly; the returns of each election therefor shall be sealed up separately and transmitted to the seat of government by the returning officers, and directed to the Speaker of the

House of Representatives, who shall, during the first week of the session, open and publish the votes cast and given for each of the respective officers hereinbefore mentioned, in the presence of both houses of the General Assembly. *The persons having the highest number of votes for each of the respective offices shall be declared duly elected thereto; but if two or more shall be equal, and highest in votes for the same office, one of them shall be chosen by the joint vote of both houses of the General Assembly, and a majority of all the members elected shall be necessary to a choice.* [Italics supplied.]

The last sentence, which we have italicized, is unambiguous and complete. It provides that the person receiving the highest number of votes (a plurality) shall be declared elected; then the draftsmen took care of any conceivable situation wherein, in a race involving any number of candidates, and in which two or more had the "equal and highest" number of votes, only those having the equal and highest votes would remain in contention. The use of the phrases "highest number of votes" and "equal and highest" number, along with the absence of the phrase "majority of the votes" makes it clear to us that the framers of the constitution were dealing in terms of plurality. We therefore hold that the requirement of § 3-806 (b), which provides for a special election in case no candidate receives a majority of the votes cast in a particular race, contravenes the plurality provision of art. 6, § 3, and is therefore void.

Appellees argue that the language, "highest number of votes" in art. 6, § 3, "means no more than this, that the person with the lowest number of votes may not be declared elected." Of course we cannot agree. Not only does the phrase have a definite connotation— it is distinctly different, when considered in light of the constitutional provision before us, from the phrase, "majority of the votes cast." Article 5, § 5 of the Indiana constitution is very similar to our art. 6, § 3, in that it provides that the persons receiving the highest num-

ber of votes cast for governor and lieutenant governor shall be elected. In *State* v. *Swift,* 69 Ind. 505 (1880), it was appropriately stated that, "This difference in language between the highest number of votes and a majority of all the votes is not the mere accident of composition; the words are used advisedly." Also, see *In re Todd,* 193 N. E. 865 (Ind. 1935), wherein it was held that the phrase "highest number of votes" meant a plurality, thus precluding the Legislature from fixing a different standard.

In the same connection we think it is significant that both the phrase "highest number of votes" and the word "majority" are used in art. 6, § 3. In providing for the exigency of a tie vote it is prescribed that one of the tying candidates shall be elected to fill the office by a majority vote of all the members of the General Assembly. Had the framers of the constitution intended that the majority rule would apply in the popular election certainly they would not have substituted the phrase "highest number of votes." Additionally, the requirement for the certification of the returns is indicative that the framers intended for the election to be settled on the general election date (except of course in case of a tie). We refer to the requirement that the election returns be sealed separately and transmitted to the speaker of the house and opened and published by the speaker during the first week of the session. So if the returns are going to be kept under seal from the time of the general election until the Legislature meets some two months thereafter, it would be impossible to conduct a second election two weeks after the general election.

Appellant relies strongly on *Vance* v. *Austell,* 45 Ark. 400 (1885). Article 13, § 3, with which *Vance* was concerned, reads:

Change of county seats—Conditions—New counties —No county seat shall be established or changed without the consent of a majority of the qualified voters of the county to be affected by such change,

nor until the place at which it is proposed to establish or change such county seat shall be fully designated. Provided, that in formation of new counties the county seat may be located temporarily by provisions of law.

In *Vance* we held the constitutional provision to be susceptible of two interpretations; and that it meant to prohibit a change in a county seat except by a majority vote of those voting at the election, rather than a majority of all the electors of the county. It was further held that the recited section prescribed the minimum vote necessary to effect a removal; and that the Legislature could extend a higher condition for removal without violating the constitution. In the first place there is no ambiguity in art. 6, § 3; secondly, the latter provision is not stated in the negative, as is art. 13, § 3. In art. 6, § 3 we find an affirmative mandate that the person receiving the highest number of votes "shall be declared duly elected."

Finally, appellees argue that the run-off election contemplated by § 3-806 (b) "is no more than a continuation of the general election and part of it, made necessary by reason of the possible failure of any candidate to receive a majority vote." The answer to that argument is that art. 6, § 3, authorizes the election to the named offices by plurality vote, making no mention of popular election by majority vote. To add the majority requirement we would have to read into the section something that is not present, even by implication. We cannot add the majority vote requirement to art. 6, § 3, because there is nothing in the context of the phraseology to indicate that intent.

Reversed, with immediate mandate to issue.